Robert L. DOHERTY, Plaintiff,

v.

RUTGERS SCHOOL OF LAW–NEWARK
et al., Defendants,

and

Asian American Law Students Association, Tom Lee Ching Chiu, and Asian American Legal Defense and Education Fund, Inc., Defendants-Intervenors,

and

Association of Black Law Students, Arlene Munn and Albert Foster, Defendants-Intervenors,

and

Association of Latin American Law Students of Rutgers Law School-Newark and Euladio Santiago and Helida Pacheco, Individually, Defendants-Intervenors,

and

The Student Bar Association of Rutgers School of Law-Newark, Federacion Latino Americanos, Lazaro Alvarez, Anthony Gartmond and Iris Muniz, Defendants-Intervenors,

and

The Women's Caucus of the Rutgers School of Law, Newark, New Jersey, Defendants-Intervenors.

Civ. A. No. 79–2698.

United States District Court,
D. New Jersey.

April 18, 1980.

As Amended April 28, 1980.

Robert L. Doherty, pro se.

Clyde A. Szuch, Ronnie F. Liebowitz, Pitney, Hardin & Kipp, Morristown, N. J., for defendant Rutgers and the individual defendants.

Stuart Ball, Ball, Hayden, Kiernan & Livingston, Newark, N. J., for defendant-intervenor Asian Am. Law Student Ass'n.

Stanley Mark, Arthur Soong, Bill Lann Lee, Asian Am. Legal Defense & Ed. Fund, Inc., New York City, for defendant-intervenor Asian Am. Legal Defense & Ed. Fund, Inc.

Ramon Ortiz, Seton Hall Law School, Newark, N. J., for defendant-intervenor Ass'n. of Latin Am. Law Students et al.

Golden Johnson, Newark, N. J., for defendant-intervenor Ass'n. of Black Law Students et al.

Morton Stavis, Lennox S. Hinds, Newark, N. J., for defendants-intervenors the Student Bar Ass'n et al.

Nadine Taub, Patricia Thornton, Denise Reinhardt, Newark, N. J., for defendant-intervenor the Women's Caucus of the Rutgers School of Law-Newark.

## OPINION

WHIPPLE, Senior District Judge.

Plaintiff in this case invites the Court to invalidate on federal constitutional and statutory grounds a minority student admissions program at the Rutgers University School of Law-Newark (hereinafter "Rutgers" or "the law school"). Defendants urge the Court to dismiss the complaint for lack of subject matter jurisdiction on account of plaintiff's alleged want of standing or, in the alternative, to impose a protective order governing certain discovery sought by plaintiff. For the reasons which follow, the Court agrees with defendants that plaintiff lacks standing to assert his claims, and is compelled to decline plaintiff's invitation to explore the import of *Bakke* as it might apply to this law school.

The procedural history of this case is somewhat involved. Plaintiff Robert L. Doherty (hereinafter "Doherty" or "plaintiff") is a white male who applied and was refused admission to the law school for the academic year commencing in the fall of 1979. In September 1979 he filed suit against Rutgers University, the State of New Jersey and various admissions officers, including minority admissions program officers. Since the original complaint was filed the State of New Jersey was ordered dismissed and various student organizations, who claimed that their interests in the continued vitality of a minority admissions program would not be adequately protected by the original defendants, were granted leave to intervene as defendants (hereinafter "defendant-intervenors").

Plaintiff's original complaint charged that defendants have adopted and maintained an admissions program which violates his rights under the fourteenth amendment to the United States Constitution, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1242. Subject matter jurisdiction was asserted under 28 U.S.C. § 1343, 42 U.S.C. § 2000e and 31 U.S.C. § 1242. Defendant Rutgers and the individual defendants moved to dismiss, arguing in their memorandum in essence that because plaintiff's academic credentials were insufficient to gain him admission to Rutgers Law School whether or not the school had a minority admissions program,

his alleged injury in being denied admission was not causally related to the existence of the minority program, and that therefore he lacked standing to challenge any aspect of the school's admissions policy.

Before the hearing on defendant's motion to dismiss, plaintiff filed an amended complaint, asserting violations of his rights under the fourteenth amendment to the United States Constitution, under the Civil Rights Act, 42 U.S.C. § 1981 *et seq.*, under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, under Title IX of the Civil Rights Act of 1972, 20 U.S.C. § 1681, under the Equal Educational Opportunity Act, 20 U.S.C. § 1703, and under Article 1, paragraph 5 of the New Jersey Constitution. Defendants Rutgers and the individuals submitted a supplemental memorandum in support of their motion to dismiss, raising essentially the same grounds as raised in the earlier memorandum. The matter was set down for oral argument.

In their memoranda and supporting affidavits Rutgers and the individual defendants argued for plaintiff's lack of standing by detailing the admissions procedure at the Law School. The admissions procedure for the year 1978–79 worked as follows.

Applicants to the law school in 1978 and 1979 received copies of the 1977–1979 Bulletin of the Law School as part of the application materials. This publication describes the steps of the admissions process. Among other things it states that the median scores of the classes entering under the regular admissions program during the then most recent five-year period were in the 3.40–3.-50 range on a 4.0 scale for the undergraduate grade point averages ("GPA") and in the 640–650 range on an 800 scale for the standardized law school admissions tests ("LSAT"). The bulletin also explains the school's minority admissions' program, which is described as a plan designed to increase the number of minorities in the school through emphasis on less objective factors in the selection process. The concept of "minority" in the minority admissions program includes economically disadvantaged whites. Approximately thirty percent of each entering class is comprised of students admitted through the minority student program.

The form of application to the law school contains a series of questions designed to determine whether a particular individual is eligible to be considered under the minority admissions program. It is not necessary that a candidate answer these questions in order to be admitted. If a candidate does not answer them, the application is considered solely under the regular admissions program criteria. If a candidate answers the questions relating to minority characteristics the application materials are forwarded to the minority admissions committee for its review of the applicant's eligibility for consideration under the minority program. If the applicant is determined not to be eligible for consideration under the minority program the application is returned to the regular admissions committee for its review of the application. Applications determined to be eligible for minority admissions consideration remain with the minority admissions committee for the final decision as to whether the applicant is admitted.

The regular admissions program has two stages. Stage one may fairly be regarded as the wholly objective stage, and it has three parts. First, the applicant's GPA is multiplied by 322. This multiplication effectively weights the GPA so that it constitutes approximately 60% of the score from the LSAT. Second, the figure which is 322 multiplied by the applicant's GPA is added to his or her LSAT score. The law school bulletin states that LSAT scores more than three years old are not considered. Finally, something called a competition bonus factor figure may be added to the sum of the two aforementioned figures. This factor has nothing to do with the applicant per se but is determined by comparing the average LSAT score from the applicant's undergraduate college with the national average LSAT score. If the average LSAT score from the applicant's undergraduate college is higher than the national average LSAT score it is assumed that the applicant's

undergraduate school is more competitive; thus the particular applicant may receive competition bonus points of 25, 50, 75 or 100, depending on the extent to which the applicant's school's LSAT average exceeds the national LSAT average. If the school's LSAT average is lower than the national average, no competition bonus points are awarded, and the applicant's stage one sum is comprised of only the weighted GPA figure and the LSAT score. The maximum score which any applicant can receive at stage one is 2188. This would be possible if a candidate had a 4.0 GPA and a 800 LSAT score.

Pursuant to Faculty-Student Admissions Committee guidelines, the Director of Admissions of Rutgers determines a point below which an applicant is rejected, commonly called the cut-off point, by comparing the lowest score from the previous year's admissions with a summary of the scores from the first 300 applicants whose files are complete.

The maximum score possible (680) from the second stage, composed of a review of four subjective areas worth a maximum of 130 points each, to wit, (1) education, (2) work experience, (3) personal information including an essay, and (4) recommendation, and a fifth factor, grade inflation, worth a maximum of 160 points, is added to the score achieved in the first stage. The areas in the second stage are established by the Rutgers Faculty-Student Admissions Committee. If the total from the first stage plus the maximum possible from the second stage is not greater than the cut-off point, then the applicant is denied admission. If the score is greater than the cut-off point, then the applicant's background is evaluated and points are assigned based upon criteria which include educational patterns, type and success of work, a recommendation, and the student's essay. The maximum possible total score of stages one and two is 2868.

The minority admissions program works slightly differently. At stage one 50% of an applicant's total score is composed of the total of his highest LSAT score (within three years of the application year) and his GPA multiplied by 322, for the same weighting effect as in the regular admissions procedure. No competition bonus points are awarded. The maximum possible score at this first stage with a 4.0 GPA and 800 LSAT is 2088. The subjective areas of the second stage constitute the remaining 50% of the applicant's score or a possible 2000 points.

According to criteria established by the Law School Faculty, the minority admissions program awards a maximum of 800 points for the applicant's education, particularly for factors such as a pattern of improvement, academic honors and graduate degrees. Work experience provides a possible 300 points for factors such as whether the work experience afforded the applicant the opportunity to use research, reading and writing skills. Working while attending undergraduate school is considered a part of this factor. A letter of recommendation is a possible 300 points, but the letter is only credible if the recommendation is clearly based on some substantive relationship between the applicant and the writer, as opposed to a social or familial relationship. Work in public interest or voluntary community causes will generate up to 300 points, and the applicant's essay can provide an additional maximum 300 points.

Plaintiff's amended complaint states in general terms that defendant admissions officers incorrectly scored his application under the criteria of both the regular and the minority admissions program. In support of their first motion to dismiss defendant officials and law school submitted affidavits and memoranda which alleged the following. Doherty applied to the law school in March 1979. Because he answered the application's questions concerning ethnicity and educational disadvantage, his application was submitted to the dean of minority admissions for review under the minority program. Doherty answered that he was a member of the "Irish American" ethnic group and that he had a "Blue collar, Middle class" socio-economic background. He aspired to work in areas of labor and constitutional law. As to being culturally

advantaged/disadvantaged, Doherty stated on the application:

> I have a cultural advantage in that I am part of a strong family unit which takes pride in our heritage. I have an economic advantage since I have worked since I was seventeen, earning enough to provide for my responsibilities and needs.
>
>     *      \*      \*      \*      \*      \*
>
> My disadvantage in applying to Rutgers is that I am a Caucasian. I view Rutgers' admissions criteria (favoring "victims" of group historical discrimination) as unjust and possibly unconstitutional.

The dean of minority admissions determined that, based upon the faculty's guidelines for eligibility, these answers did not establish this applicant's eligibility under the minority admissions program guidelines. He therefore returned Doherty's application packet for review in accordance with the regular admissions process.

Defendants further alleged that Mr. Doherty's GPA was 1.85. That number multiplied by 322 equals 596. They alleged that his highest LSAT score in 3 years was 576. Because his undergraduate school's average LSAT was less than the national average he received no competition bonus points. Defendants alleged that thus his total score for the first stage was 1172 out of a possible 2188. Before evaluating the subjective criteria, the maximum possible of 680 points from those criteria were added to determine whether the plaintiff had a chance to be admitted. The cut-off point which had been established by the admissions committee was 2060 (and in fact no student was admitted with a score less than that number). Even with the assumption that he would receive the full 680 points, Doherty's total score was allegedly 1852, far below the cut-off score. The subjective criteria were therefore not evaluated and Doherty was sent a rejection letter on May 31, 1979.

Defendants further alleged that Doherty's score of 1852 was lower than the scores of the 374 applicants who were admitted under the regular admissions, lower than each of the 213 regular admissions applicants who made the waiting list, and lower than each of 672 other regular admissions applicants[1] who were also denied admission.

Defendants also alleged that had Doherty's application been evaluated under the minority admissions program his total points for both the objective and subjective factors would have been 1,672, or some 128 points below the cut-off score of 1800 established for the minority program in the 1979 admissions season. This score of 1,672 was arrived at after Doherty filed suit, as part of defendants' preparation of its motion to dismiss, and therefore defendants' scoring of the subjective factors must be considered with some degree of scepticism. Nevertheless, whatever score Doherty might have received under a wholly unbiased review of his application under minority admissions criteria is, without more, irrelevant to the instant action, for Doherty's suit seeks to dismantle this very program on the ground that it is unconstitutional. Plaintiff cannot with logical consistency seek to establish standing to challenge and dismantle a minority admissions program *solely* by showing that he had academic credentials sufficient to be admitted under that same program, for his complaint is that the minority admissions program is the source of his alleged injury. Rather, in order to have standing plaintiff must establish either of two sets of facts: (1) that he possesses the qualifications to have been admitted were there only a single admissions program at Rutgers, of course taking into account that the number of available places under a single admissions program would be increased by 128 were there no minority admissions program,[1] *see Donnelly v. Boston College,* 558 F.2d 634, 635 (1st Cir. 1977); *DiLeo v. Board of Regents of University of Colorado,* 590 P.2d 486, 489 (Colo.1978) (en banc), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2042, 60 L.Ed.2d 402 (1979); *see also Henson v. University of Arkansas,* 519 F.2d 576, 577–78

---

1. This figure is derived from the fact that 128 applicants were admitted under the challenged minority program in the year in question.

(8th Cir. 1975); or, (2) that he was prohibited from competing for any of the minority program seats simply because of his race. See Regents of University of California v. Bakke, 438 U.S. 265, 280–81 n.14, 98 S.Ct. 2733, 2743–44 n.14, 57 L.Ed.2d 750 (1978).

■ Determining which set of facts plaintiff must establish to show standing depends on the nature of his alleged injury. "The constitutional element of standing is plaintiff's demonstration of any injury to himself that is likely to be redressed by a favorable decision of his claim." Id. at 281 n.14, 98 S.Ct. at 2743, quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). If plaintiff's alleged injury is his rejection by the law school[2] then merely to establish that he possesses the minimum qualifications for admission under the challenged minority admissions program[3] is insufficient to meet the federal constitutional requirements of standing. This is so because a favorable decision of plaintiff's claim that the minority program is unconstitutional would not by itself serve to redress the "injury" of rejection by the law school: dismantling the minority admissions program would not magically raise plaintiff's grades to a level sufficient to be admitted were no applicants given special consideration on account of racial, cultural or ethnic characteristics. Alternatively, if plaintiff's claimed injury is that he was not permitted to compete for all places in the class simply because of his race, then he might have standing regardless of his academic qualifications, for such an injury could be redressed simply by ordering the law school to allow him to compete for all of the seats. See Bakke, supra at 281 n.14, 98 S.Ct. at 2744 n.14.

Oral argument was heard on defendants' first motion to dismiss on January 14, 1980. This hearing proved something of a surprise to defendants, to defendant-intervenors and to the Court. In response to defendants' motion to dismiss, plaintiff for the first time fleshed out the vague claims in his amended complaint that his application and supporting materials were incorrectly scored. Plaintiff claimed: (1) that his correct undergraduate GPA was 2.29, not 1.85; (2) that his highest LSAT score was 621, not 576; (3) that he should have received 100 competition bonus factor points (the maximum obtainable) on account of the fact that this factor was not in use in 1965, the date of the alleged 621 LSAT score, and that a 621 score in 1965 placed him in the top 15% of all those who took the test in the years 1961–64; (4) that he should have received points for a pattern of improvement in education; (5) that he should have been "invited" to submit writing samples in order to boost his score under the minority admissions program; (6) that the letter of recommendation submitted by his lawyer should have received a higher score, or that in the alternative "further inquiry should have been made" of its author, presumably in order that the score could be boosted; and (7) that he should have received the maximum number of points (300) for work experience instead of the score he actually received (200). Although plaintiff urged at the first hearing, and continues to urge, that in order to establish standing he need only show the minimum qualifications for the minority program, he claimed that he had the minimum qualifications necessary for the regular admissions program.

Concerned about the factual discrepancies between defendants' and plaintiff's claims with respect to plaintiff's GPA and highest LSAT score, the Court denied the motion to dismiss without prejudice and ordered an evidentiary hearing solely for the purpose of determining whether plaintiff's academic credentials were sufficient to afford him standing.

The next significant step in this saga was taken by plaintiff. He sought to discover all of the applications to the law school for

---

2. The uncertainty as to the precise nature of plaintiff's alleged injury stems from the fact that his complaint is unclear as to whether the injury is rejection by the law school or not being allowed to compete for all the seats or both.

3. A proposition which is cast into considerable doubt by defendant-University's affiants.

the admissions season 1978–79 in connection with the scheduled evidentiary hearing. Apparently concerned about potential liability to both rejected and accepted applicants for possible privacy right violations, the law school moved for a protective order to insure that confidential data on these applicants would not be publicized. Defendant-intervenors joined in the law school's motion. Oral argument was held on March 4, 1980. Intervenors argued in support of the motion that plaintiff was not entitled to the desired discovery on the grounds that he lacked standing; this argument, which will be discussed *infra*, took account of plaintiff's January 14th claims of incorrect scoring of his application. The Court reserved decision on this motion.

Next, defendant-intervenors filed their own motion to dismiss, which was heard on March 10, 1980. Essentially the intervenors reasserted their argument in opposition to plaintiff's discovery of the law school applications. The Court reserved decision on this motion. Finally, defendant law school and admissions officers renewed their motion to dismiss, and this was heard on April 14, 1980. Defendants argued along the same basic lines as intervenors, taking account of plaintiff's seven claims of January 14th. Affidavits supporting defendants' factual claims were also submitted. The Court reserved decision on this motion.

Defendants' and defendant-intervenors' argument in support of the pending motions is simply that plaintiff's factual claims are false. Starting with plaintiff's first claim, movants assert that plaintiff's GPA was, as originally alleged, 1.85. They claim that plaintiff's alleged 2.29 GPA is based on his own calculations, pursuant to which the several "F's" and "D's" which he received were not counted because he repeated those courses and received higher grades, which were counted in the GPA. However, as movants' affiants state, and as is known or should be known by every applicant to Rutgers Law, the school ascertains an applicant's GPA through the use of a service used by virtually every law school in the United States, the Law School Data Assembly Service (LSDAS). In order to supply its clients with the best objective profile of a candidate as is possible, LSDAS uses certain procedures in assembling undergraduate academic data. One such procedure is to count all of the applicant's grades in computing the GPA. Thus, if an applicant has received an "F" in a course and repeats that course, earning a "B" the second time around, LSDAS counts both grades, *regardless of how the individual applicant's college computes the GPA for purposes of its records.* Thus, as movants' affiants demonstrated, plaintiff's 2.29 GPA computation results only if one deviates from the standard LSDAS procedure and discounts the courses he failed. once he repeated those courses satisfactorily; following LSDAS procedures, plaintiff's GPA is indeed 1.85. As there is no claim that the law school's decision to use LSDAS is constitutionally infirm, plaintiff's claim to have a 2.29 GPA must be rejected. *See generally Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 87–88 n.4, 90–92, 98 S.Ct. 948, 953–954 n.4, 955–956, 55 L.Ed.2d 124 (1978).

Turning to plaintiff's claim to a 621 LSAT score, plaintiff concedes that this score was earned in 1965. The law school bulletin expressly states the admissions committee's policy of not considering scores more than three years old. This policy is rationally related to the law school's goal of acquiring a current profile of a candidate and will not be invalidated by this Court. *See id.* Plaintiff's highest LSAT score within three years of the date of his application was, as originally claimed, 576.[4]

4. The remainder of plaintiff's claims alleging incorrect scoring are irrelevant on account of plaintiff's low stage one score, but in any event can be disposed of summarily by noting that all seek to have this Court review discretionary, subjective decisions of academic officers respecting general admissions policies and/or the scoring of the subjective factors on plaintiff's application. This is precisely the sort of academic terrain upon which a federal court should not tread. *See Horowitz, supra,* 435 U.S. at 87–88 & n.4, 90–91 & n.6, 98 S.Ct. at 953–954 & n.4, 955–956 & n.6; *id.* at 96 n.6, 98 S.Ct. at 958 n.6 (Powell, J., concurring).

Taking these two facts together, it follows that plaintiff's absolute maximum score for stage one under the regular admissions program was, as defendants originally claimed, 1,852, while the cut-off score was 2,060.[5] Assuming first that plaintiff's alleged injury was his rejection by the law school, it is clear that this injury would not be redressed by a decision invalidating the minority program, for if there were no minority program in the admissions season 1978–79, the additional 128 seats which would have become available would surely have been offered to and filled by a portion of the 885 regular admissions applicants whose stage one scores were higher than plaintiff's but who were also denied admission.[6] Thus, to the extent that his injury is rejection by the law school, plaintiff is without standing.[7]

Turning to the possibility that plaintiff's alleged injury is not being permitted to compete for all of the seats at the law school simply because of his race, see Bakke, supra, 438 U.S. at 280–81 n.14, 98 S.Ct. at 2743–44 n.14, such an allegation is simply without a basis in fact. Defendants' affidavits and exhibits demonstrate, and plaintiff does not dispute, that no applicant is prohibited from being considered under the minority program on account of his or her race or ethnic background. As already noted, the concept of "minority" in the challenged program includes economically disadvantaged whites. Unlike the admissions program in Bakke, which was found to be facially infirm because it totally and unconditionally excluded members of the white race from competing for a pre-ordained number of seats at a medical school, see Bakke, supra, 438 U.S. at 318, 319, 98 S.Ct. at 2763, 2764, an applicant of any racial or ethnic background may compete for minority admissions seats at Rutgers. Thus, unlike Allan Bakke, plaintiff cannot claim, as an injury upon which to predicate standing, that he was denied an opportunity to compete for seats for racial or ethnic reasons.

To summarize, plaintiff is without standing to challenge the law school's minority admissions program because his complaint intimates two possible injuries upon which standing could be predicated. The first possible injury, rejection from the law school, is simply not fairly traceable to defendants' acts in establishing and administering the minority program, but is instead the result of plaintiff's academic deficiencies relative to other law school applicants. As to the second possible injury, not being permitted to compete for minority admissions seats on the basis of race or ethnic origin, this claim is rejected on the basis of the submitted affidavits and exhibits, including the law school bulletin, as without a basis in fact.[8] Simply put, plaintiff's academic status renders his claim nothing more than a personal, generalized view regarding the constitutionality and legality of the law school's policies. As the Third Circuit has recently stated: "Failure to set forth individuated injury . . . even in the presence of a 'case or controversy', deprives a litigant of standing." Americans United for Separation of Church & State, Inc. v. HEW, 619 F.2d 252, at 255 (3d Cir. 1980). This is so because the fundamental constitutional requirement of standing focuses not on the merits of plaintiff's claim but instead on the status of the litigant. See id. at 258; Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

For all of the foregoing reasons defendants' and defendant-intervenors' motions to dismiss for lack of subject matter jurisdiction will be granted, with prejudice. Their motion for a protective order is moot. Counsel for defendants shall submit an appropriate order within seven (7) days.

---

**5.** See text at p. 1295, supra.

**6.** See text at pp. 1295–1296, supra.

**7.** See text at p. 1296, supra.

**8.** Indeed, plaintiff at no time has denied that white males are permitted to apply and may be admitted under the minority program.