Robert L. DOHERTY, Appellant,

v.

RUTGERS SCHOOL OF LAW–NEWARK;
State of New Jersey; Peter Simmons,
Dean; Stevens L. Lefelt, Director of Ad-
missions; Oliver B. Quinn, Assistant
Dean For Minority Student Program;
and the Faculty-Student Committee of
Admissions; Appellees,

and

Asian American Law Students Associa-
tion, Tom Lee Ching Chiu, and Asian
American Legal Defense and Education
Fund, Inc.; and Association of Black
Law Students, Arlene Munn and Albert
Foster; and Association of Latin Ameri-
can Law Students of Rutgers School of
Law-Newark, Uladio Santiago and Heli-
da Pacheco; and The Student Bar Asso-
ciation of Rutgers School of Law-New-
ark Federacion Latino Americanos, La-
zaro Alvarez, Anthony Gartmond and
Iris Muniz; and The Women's Caucus of
the Rutgers School of Law, Newark,
New Jersey, Intervenors.

Nos. 80–1786, 80–1787.

United States Court of Appeals,
Third Circuit.

Argued Jan. 12, 1981.

Decided June 16, 1981.

Robert L. Doherty (argued), pro se.

Clyde A. Szuch (argued), Marc S. Klein, Pitney, Hardin & Kipp, Morristown, N. J., for appellees Rutgers, The State University, Peter Simmons, Steven L. Lefelt, and Oliver B. Quinn; Ronnie F. Liebowitz, University Counsel, Morristown, N. J., of counsel.

John J. Degnan, Atty. Gen. of New Jersey, Mark I. Siman, Deputy Atty. Gen. (argued), Trenton, N. J., for appellee, State of New Jersey; Erminie L. Conley, Asst. Atty. Gen., Trenton, N. J., of counsel.

Patricia A. Thornton, Urban Legal Clinic, Newark, N. J., for intervenor, Association of Black Law Students, et al., Ramon Ortiz, Newark, N. J., for intervenor, Association of Latin American Law Students, et al.

Morton Stavis and Lennox Hinds, Newark, N. J., for intervenor, Student Bar Ass'n, et al.; Patricia A. Thornton, Nadine Taub, Frank Askin, Denise Reinhardt, Newark, N. J., on brief.

Nadine Taub, Denise Reinhardt, Newark, N. J., for intervenor, The Women's Caucus of the Rutgers School of Law.

Before SEITZ, Chief Judge, and ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

The issue presented in this appeal is whether an applicant for admission to a state university law school may challenge the law school's admission policies in the face of a finding that he did not possess the qualifications to have been admitted in the absence of the minority student program he challenges. The district court, after conducting an evidentiary hearing on the issue, held that the applicant lacked standing and granted the defendants' motion to dismiss. *Doherty v. Rutgers School of Law-Newark*, 487 F.Supp. 1291 (D.N.J.1980). We affirm.

### II.

#### A.

#### *The Complaint Allegations*

Robert Doherty, appellant, filed this pro se action after the rejection of his application for admission to the Rutgers University School of Law at Newark (hereinafter referred to as "Rutgers" or "the Law School") for the 1979–80 academic year. He sued the Law School, several of its administrative officials, and the State of New Jersey[1] alleging that the Law School had adopted an admissions procedure which violated his rights under the Fourteenth Amendment to the United States Constitution; the Civil Rights Act, 42 U.S.C. §§ 1981 *et seq.* (1976); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (1976); Title IX of the Civil Rights Act of 1972, 20 U.S.C. § 1681 et seq. (1976); Title II of the Equal Educational Opportunity Act, 20 U.S.C. § 1703 et seq. (1976); and Article I, paragraph 5 of the New Jersey

1. The district court dismissed the complaint against the State of New Jersey for failure to state a claim. In view of our disposition of this case on the issue of appellant's standing, we need not consider the validity of that ruling.

Constitution.[2] Essentially, Doherty attacks the Minority Student Admissions Program at the Law School which reserves 30% of the available positions for "minorities", a classification which includes "disadvantaged" white applicants. He also claims that the Law School reserves 50% of the admissions for women, which it allegedly accomplished by changing admissions criteria until this percentage of women was obtained.

Some explanation of the Rutgers' admission process is necessary to an understanding of the standing issue on which this case turns. The material facts concerning that process and Doherty's qualifications were presented by Rutgers in various affidavits and exhibits in support of its motion to dismiss the complaint. Doherty submitted no responsive affidavits or other evidence, so the essential facts are uncontroverted.

### B.

### Rutgers' Admissions Programs

### 1. The Regular Admissions Program.

Students considered for admission to the Law School under the regular admissions program at the relevant time were evaluated under both objective and subjective criteria. The objective stage was based on three factors: the applicant's college grade point average (GPA) as computed and provided to the Law School by the Law School Data Assembly Service (LSDAS);[3] the applicant's score on the Law School Admissions Test (LSAT), which is administered several times a year by the Educational

Testing Service, and the "competition bonus" (CB) element by which the Law School seeks to adjust for highly competitive undergraduate schools by awarding an applicant 25, 50, 75 or 100 CB points, depending on the extent to which the average LSAT score from the applicant's undergraduate college is greater than the national average LSAT score. The first stage score is calculated by adding the sum of the GPA multiplied by 322 to the LSAT score and the CB points, if any. The maximum possible score from the objective criteria considered in the first stage is 2188, which would be achieved if an applicant had a 4.0 GPA and an 800 LSAT score, and received all 100 CB points.

The second stage of review in the regular admissions program considers five subjective factors: (1) education; (2) work experience; (3) personal information, including an essay; (4) a recommendation; and (5) grade inflation. A maximum of 130 points can be awarded for each of the first four factors in the second stage and a maximum of 160 points can be awarded for the fifth. The maximum possible score from this stage is thus 680 points. No points are awarded on account of the applicant's sex. The factors in the second stage and their weight are established by the Faculty-Student Admissions Committee. The maximum possible total score of stages one and two is 2868.

Pursuant to Faculty-Student Admissions Committee guidelines, the Director of Admissions determines a point below which an applicant is rejected, commonly called the cut-off point, by comparing the lowest score from the previous year's admissions with a

---

**2.** The district court granted the motion of the following to intervene as defendant-intervenors: Asian American Law Students Association, Tom Lee Ching Chiu, and Asian American Legal Defense and Education Fund, Inc., Association of Black Law Students, Arlene Munn and Albert Foster; Association of Latin American Law Students of Rutgers Law School-Newark and Euladio Santiago and Helida Pacheco, individually; The Student Bar Association of Rutgers School of Law-Newark, Federacion Latino Americanos, Lazaro Alvarez, Anthony Gartmond and Iris Muniz; and The Women's Caucus of the Rutgers School of Law, Newark,

New Jersey. The defendant-intervenors also filed a motion to dismiss the amended complaint which was granted along with Rutgers' motion on April 29, 1980.

**3.** LSDAS is operated by the Educational Testing Service under policies and procedures established by the Law School Admission Council, a non-profit corporation consisting of one representative from each law school accredited by either the American Bar Association or the Association of American Law Schools.

summary of the scores from the first 300 applicants whose files are complete. If the total from the first stage plus the maximum possible from the second stage is not greater than the cut-off point, the applicant is denied admission. If the score is greater than the cut-off point, the applicant's background is evaluated and points are assigned based upon the subjective criteria, set forth above, of the second stage.

2. *The Minority Student Program.*

The Minority Student Admissions Program (MSP) is described in the Law School Bulletin as a plan designed to increase the number of minorities in the school through emphasis on less objective factors in the selection process. Thirty percent of the entering class is composed of students admitted through the minority student program. The concept of "minority" in the MSP includes economically or culturally disadvantaged white applicants.

Determination of an applicant's eligibility for consideration under the MSP is based on the applicant's response to questions regarding his or her racial group, ethnic group and socio-economic background, which seek to ascertain whether the applicant is culturally, economically or educationally disadvantaged in some way. If the Director of MSP, who reviews the applications, finds the applicant to be eligible, the application is evaluated according to MSP guidelines. Otherwise, the application is returned for consideration under the regular admissions program.

Evaluation under the Minority Student Program also has two stages, but differs from the regular admissions process in that near equal weight is given to both the "objective" and "subjective" criteria. The first stage score is composed of the applicant's

GPA multiplied by 322, plus the applicant's LSAT score. No CB points are awarded. Thus the maximum possible score is 2088.

In the second stage various subjective factors are scored according to criteria established by the Law School Faculty. A maximum of 800 points may be awarded for the special circumstances pertaining to an applicant's education, particularly a pattern of improvement, academic honors and graduate degrees. Work experience provides a possible 300 points. A letter of recommendation may be worth a maximum 300 points. Work in public interest or voluntary community causes could merit up to 300 points, and the applicant's essay can provide an additional 300 points. The maximum possible points from the second stage is 2000.

### C.

#### *Doherty's Qualifications*

Doherty applied to the Law School in March 1979. Although he responded to the optional questions in the application concerning ethnicity and cultural, educational and economic disadvantages, his response was that he had a "cultural advantage", and he concedes that he did not seek admission through the MSP and is not "disadvantaged" within the scope of that program.[4] His application was in fact reviewed under the Minority Student Program because he had responded to the optional questions but he was found ineligible under the MSP guidelines and his application was thereafter reviewed under the regular admissions program.

Doherty's GPA as determined by LSDAS was 1.85, his relevant LSAT score was 576, and he was not entitled to any CB points

---

4. He stated that he was a member of the "Irish American" ethnic group and that he had a "Blue collar, Middle class" socio-economic background. In response to questions asking whether the applicant had been culturally, economically or educationally advantaged or disadvantaged in some way, Doherty replied:

> I have a cultural advantage in that I am part of a strong family unit which takes pride in our heritage. I have an economic advan-

tage since I have worked since I was seventeen, earning enough to provide for my responsibilities and needs.

\* \* \* \* \* \*

My disadvantage in applying to Rutgers is that I am a Caucasian. I view Rutgers' admissions criteria (favoring "victims" of group historical discrimination) as unjust and possibly unconstitutional.

because the average LSAT score of his undergraduate school, Montclair State College, was less than the national average. Thus, his score from the objective factors was calculated as 596 (GPA 1.85 × 322) + 576, or 1172 of a possible 2188 points.[5]

To determine whether Doherty's application could pass the cut-off point, which was 2060 points for the year 1979, the maximum possible 680 points from the subjective criteria were added to Doherty's score. On the assumption that Doherty would receive the full 680 points for the subjective criteria, his total score was 1852, far below the cut-off score. Therefore, the subjective information provided on Doherty's application was not evaluated and he was sent a rejection letter on May 31, 1979.

D.

*District Court Opinion*

 The district court determined that in order to have standing to challenge the MSP, Doherty had to establish either that "he possesses the qualifications to have

been admitted were there only a single admissions program at Rutgers" or that "he was prohibited from competing for any of the minority program seats simply because of his race." 487 F.Supp. at 1295–96. After reviewing the complaint, as amended, together with the uncontroverted affidavits filed by Rutgers, the district court determined that Doherty failed to meet either test.[6] With regard to the first test the district court concluded that based on a comparison of Doherty's low objective score and the scores of other applicants, Doherty would not have been admitted to the Law School even if the 128 seats set aside for the MSP were made available by a decision invalidating the program.

Giving Doherty the benefit of the assumption that he qualified for all possible points in the subjective second stage, his potential score of 1852 points was lower than the scores of the 374 applicants who were offered admission through the regular program; lower than the scores of the 213 applicants on the waiting list; and lower than the scores of 672 applicants who were

---

5. At the hearing before the district court, Doherty contended his score was incorrectly calculated, since he claimed his GPA should be calculated as 2.29, not 1.85, and his LSAT score as 621, rather than 576. Doherty arrived at the 2.29 GPA by failing to count the grades of F and D which he initially received in courses he later satisfactorily repeated. The procedure followed by LSDAS averages *all* the applicant's grades in computing his or her GPA. Using the LSDAS procedure, Doherty's GPA is, as calculated by the Law School, 1.85. Doherty also sought to have the Law School use his fourteen year old LSAT score of 621 rather than the more current score of 576. It is undisputed that it was the Law School's policy to consider only those LSAT scores earned within three years of application, and the Law School Bulletin so stated. Doherty does not raise either of these points on appeal.

6. The procedure followed by the district court accords with that recommended by the Supreme Court in *Warth v. Seldin*, 422 U.S. 490, 501–02, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). Although courts must accept as true all material allegations in the complaint and construe the complaint in favor of the complaining party, it is within the trial court's power "to require the plaintiff to supply, by amendment to the complaint or by affidavits, further

particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Id.* Similarly, to avoid an unnecessary trial, the district court may conduct a preliminary evidentiary hearing on standing. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *NAACP v. Harris,* 607 F.2d 514, 526 n.15 (1st Cir. 1979); *Marchezak v. McKinley,* 607 F.2d 37, 40 (3d Cir. 1979).

The district court gave Doherty ample opportunity both before and after the evidentiary hearing to amend his complaint or submit affidavits or other materials in support of the allegation in his amended complaint that "I would have been admitted if my rights had not been violated." Since Doherty elicited no facts at the evidentiary hearing nor submitted any materials in support of this allegation, the district court was justified in rejecting this wholly unsupported and conclusory allegation in Doherty's amended complaint. *Cf. Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 72, 74 n.19, 98 S.Ct. at 2629, 2630 n.19; *Hackett v. McGuire Bros., Inc.,* 445 F.2d 442, 444 (3d Cir. 1971).

also denied admission.[7] The court reasoned that "the additional 128 seats which would have become available would surely have been offered to and filled by a portion of the 885 regular admissions applicants whose stage one scores were higher than plaintiff's but who were also denied admission." *Id.* at 1298.

With regard to the second prong of its standing inquiry, the district court concluded that any contention by Doherty that he was precluded from competing for all the seats at the law school simply because of his race was "without a basis in fact." The court reasoned:

> Defendants' affidavits and exhibits demonstrate, and plaintiff does not dispute, that no applicant is prohibited from being considered under the minority program on account of his or her race or ethnic background. As already noted, the concept of "minority" in the challenged program includes economically disadvantaged whites.

*Id.* Since Doherty failed both prongs of the district court's test, the court granted Rutgers' motion to dismiss.

### III.

■ In considering the justiciability requirement emanating from the "case or controversy" language in Article III of the Constitution, the Supreme Court has framed the relevant inquiry to be whether a plaintiff has " 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). This interpretation of standing assures "that concrete adverseness which sharpens

the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). As refined by subsequent cases, the necessity of a "personal stake" requires that the plaintiff show not only a "distinct and palpable injury" to him, her or it but also that there is a "substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 79, 98 S.Ct. 2620, 2629, 2633, 57 L.Ed.2d 595 (1978); *Marchezak v. McKinley,* 607 F.2d 37, 39 (3d Cir. 1979). In other words, "to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury *as a result of* the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (emphasis added). Doherty's rejection from law school adequately satisfies the injury in fact requirement of standing, but we agree with the district court that he failed to sustain his burden of showing "an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

■ Applying the latter standard to this case, Doherty would have had to show that he met the criteria needed for acceptance to Rutgers Law School under the regular admissions program. Otherwise he could not benefit from a ruling that the challenged admission practices are unconstitutional. The courts which have considered challenges to affirmative action programs at academic institutions have consistently dis-

---

7. All 128 students offered admission through the MSP and all 63 on the MSP waiting list had GPA's and LSAT's which in combination were higher than Doherty's score. Since it was determined that Doherty was ineligible for consideration under the MSP, no contemporaneous determination was made of his subjective qualifications under the MSP criteria. In the affidavits in support of their motion to dismiss, Rutgers alleged that if Doherty's application had been evaluated under the MSP criteria he would have received a total of 1,672 points for both "objective" and "subjective" factors. It was further alleged that no one with a combined score of less than 1700 was admitted to the MSP. The district court found that given the post hoc nature of the evaluation, Rutgers' scoring of the "subjective" factors "must be considered with some degree of scepticism." 487 F.Supp. at 1295.

missed suits brought by applicants who the courts concluded would not otherwise have been admitted. *See Donnelly v. Boston College*, 558 F.2d 634 (1st Cir.) (per curiam), *cert. denied*, 434 U.S. 987, 98 S.Ct. 618, 54 L.Ed.2d 483 (1977); *Henson v. University of Arkansas*, 519 F.2d 576 (8th Cir. 1975) (per curiam); *DiLeo v. Board of Regents of Univ. of Colo.*, 196 Colo. 216, 590 P.2d 486 (1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2042, 60 L.Ed.2d 402 (1979). *See also Harris v. White*, 479 F.Supp. 996, 1008 (D.Mass. 1979). In rejecting a claim by an unsuccessful applicant that the defendants impermissibly granted preferences to applicants from minority groups, the Court of Appeals for the First Circuit stated:

> The claim that is based upon the defendant law schools' alleged practice of impermissibly granting preferences to applicants from minority groups suffers from a fundamental defect. The affidavits clearly show that plaintiff would not have been admitted to any of the law schools even if no minority group members had been admitted. Since the undisputed facts show that the allegedly illegal conduct could not have caused plaintiff any injury, summary judgment was mandatory.

*Donnelly v. Boston College*, 558 F.2d at 635. In contrast, where defendants did not contest the allegations of the complaint that the plaintiff was qualified to attend the two defendant medical schools based on both objective and subjective criteria and that both schools admitted persons with less impressive objective qualifications than plaintiff, the Court, without discussion of the standing issue, permitted plaintiff to challenge the admissions process. *Cannon v. University of Chicago*, 441 U.S. 677, 680 n.2, 99 S.Ct. 1946, 1949 n.2, 60 L.Ed.2d 560 (1979).

■ The rationale for these holdings stems from the requirement that a plaintiff must establish more than the mere abstract unconstitutionality of the policies under attack. Otherwise, any unsuccessful applicant could maintain a suit challenging admission policies which have not adversely affected that applicant, and which did not contribute in any way to the decision rejecting that person's application.

■ Since the evidence is undisputed that Doherty's objective score indicated he was not qualified, in a relative sense, to attend the Law School, he has no standing to challenge Rutger's allegedly discriminatory admissions practices. As previously noted, even making the unlikely assumption that Doherty would have received all 680 possible points in the subjective stage, Doherty's total score would be 1852, lower than the 213 applicants on the waiting list and 672 of the applicants who were also denied admission. Under these circumstances, even if the MSP were invalidated and the 128 admissions under that program were thereupon made available to the regular admissions program, Doherty could not show a "substantial likelihood" that his injury, rejection of his application for admission, would be redressed.[8] Doherty's rejection was not "a result of the putatively illegal conduct of the defendant[s]," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. at 99, 99 S.Ct. at 1608, but rather was a result of Doherty's "academic deficiencies relative to other law school applicants." 487 F.Supp. at 1298.

The district court also held that Doherty would be accorded standing were he able to show that he was not permitted to compete for minority admission seats on the basis of race or ethnic origin, but that Doherty failed to show any basis in fact for his allegation that this was so. Both the district court's test and Doherty's claim are

---

8. Doherty's contention that the regular admission program deprives males of equal protection because the subjective criteria used in that program allegedly favor women goes to the merits and need not be considered in connection with the issue of his standing. He may be arguing that because the subjective criteria chosen disproportionately favor women, it was improper to gauge his qualifications under the regular admissions procedure. However, since his comparison to the other applicants was made on the assumption that he would have received all of the 680 possible points for the subjective criteria, and there were still over 1000 applicants with better scores, he could not be harmed by using the regular admissions procedure as the basis of comparison.

derived from a footnote in Justice Powell's opinion in *Regents of University of California v. Bakke*, 438 U.S. 265, 281 n.14, 98 S.Ct. 2733, 2743 n.14, 57 L.Ed.2d 750 (1978). Doherty claims that opinion supports his position that he has standing because white applicants must show that they are "disadvantaged" before they are considered under the MSP while racial minorities are automatically eligible for consideration under that program.

In *Bakke*, a white male who had twice been refused admission to the University of California Medical School challenged the school's special admissions program which set aside 16 of the 100 available seats for "disadvantaged" applicants, a category that under University practice excluded white applicants. *Id.* at 279 & n.12, 98 S.Ct. at 2742 & n.12. Bakke alleged that the Medical School's special admission program operated to exclude him on the basis of race in violation of the equal protection clause and Title VI of the Civil Rights Act of 1964. Bakke's objective qualifications and "strong benchmark score" were comparable with those of applicants admitted through the regular admissions program and were significantly higher than the qualifications of applicants admitted through the special admissions program. *Id.* at 276, 277 & n.8, 98 S.Ct. at 2740, 2741 & n.8. In addition, the University in *Bakke* conceded that it could not prove that Bakke would have been refused admission in the absence of the special program. *Id.* at 280, 98 S.Ct. at 2742. Nevertheless, several *amici* argued that Bakke lacked standing because he never showed that his injury—exclusion from the Medical School—would be redressed by a favorable decision. Justice Powell responded to this argument in footnote 14 to Part I of his opinion, a section of the opinion that was joined by four other Justices. He stated:

> [E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing. The constitutional element of standing is plaintiff's demonstration of any injury to himself that is likely to be redressed by favorable decision of his claim. *Warth v.*

*Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). The trial court found such an injury, apart from failure to be admitted, in the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race. Record 323. Hence the constitutional requirements of Art. III were met. The question of Bakke's admission vel non is merely one of relief. Nor is it fatal to Bakke's standing that he was not a "disadvantaged" applicant. Despite the program's purported emphasis on disadvantage, it was a minority enrollment program with a secondary disadvantage element. White disadvantaged students were never considered under the special program, and the University acknowledges that its goal in devising the program was to increase minority enrollment.

438 U.S. at 280 n.14, 98 S.Ct. at 2742 n.14.

The meaning of this footnote must be derived from the circumstances of that case. Bakke had superior objective and subjective qualifications. He clearly was qualified for admission and the trial court so found. *Bakke v. Regents of the University of California*, slip op. at 5, No. 31287 (Calif.Super.Ct. Mar. 7, 1975), reprinted in Appendix F to petitioner's brief in the Supreme Court. Therefore, the trial court found as a fact that Bakke was injured in not being able to compete for 16 of the 100 available seats because it "substantially reduce[d] plaintiff's chances of successful admission to the medical school." *Bakke v. Regents of the University of California*, Notice of Intended Decision, slip op. at 13, No. 31287 (Calif.Super.Ct. Nov. 25, 1974), reprinted in Appendix D to petitioner's brief in the Supreme Court. It was this finding of injury to which Justice Powell appears to be referring in footnote 14 as supporting standing separate and apart from the injury in not being admitted because of the reservation of 16 seats for non-white applicants.

Viewed in this light, the *Bakke* footnote represents a rejection of the claim that an unsuccessful candidate must prove to a certainty the s/he would have been admitted before being accorded standing. The

credentials of applicants to universities, and particularly professional schools, are too closely clustered to make it reasonable to impose that burden on an unsuccessful applicant. Instead, the import of the *Bakke* footnote is that although an applicant may not be able to show s/he would have been *admitted* in the absence of the challenged discriminatory program, s/he will nonetheless have standing if there was a chance of successful admission had s/he not been prohibited from competing for all the seats. On the other hand, if, using the University's criteria, the applicant still would not have had a realistic chance of successful admission, there could be no injury from an inability to compete for all the available seats. Were Doherty's literal reading of the *Bakke* footnote correct, any applicant, no matter how far-fetched his or her chances of admission, would be permitted to challenge the admissions procedure. We do not believe the Supreme Court intended that footnote to reflect an abandonment of all of its analysis of standing developed in other cases.

As shown above, here, in contrast to the situation in *Bakke*, Doherty, based on his qualifications relative to the other applicants, did not meet the criteria needed for acceptance for any of the seats at Rutgers Law School. Thus, Doherty could not have been injured as a result of his inability to compete for all the seats in the MSP on the same basis as non-white applicants.

Finally, Doherty challenges the MSP on the ground that he must prove disadvantage while minorities are automatically eligible for consideration under that program. Doherty lacks standing to raise such a challenge, however, because he would be unable to obtain MSP consideration even if all applicants were required to show disadvantage in the same manner. By Doherty's own admission, he is not "disadvantaged" under the Law School's standards. Requiring minority applicants, like white applicants, to prove disadvantage could not enhance Doherty's chance of receiving MSP consideration and a place in the Law School class. Therefore, Doherty can obtain no benefit from a requirement that all applicants prove disadvantage.

In summary, standing will be accorded to those who can benefit from the desired ruling on the merits. Even if a court were to reach the merits of Doherty's claim, the desired relief could at most affect the existence of the MSP as such or the automatic classification of racial and ethnic minorities as disadvantaged within the MSP. Neither holding would substantially increase Doherty's chances of admission to the Law School.

For the foregoing reasons, the district court's order dismissing the complaint for lack of standing will be affirmed.