Terry M. VALENTINE, on behalf of himself and all others similarly situated, Plaintiffs,

v.

The DRUG ENFORCEMENT ADMINISTRATION OF the UNITED STATES DEPARTMENT OF JUSTICE, Peter Bensinger, Administrator of the Drug Enforcement Administration of the United States Department of Justice, Jesse Gallegos, EEO Director, Drug Enforcement Administration of the United States Department of Justice, the United States Equal Employment Opportunity Commission, and James H. Troy, Director, Office of Equal Employment Opportunity, Equal Employment Opportunity Commission, Defendants.

No. 80 C 1373.

United States District Court, N. D. Illinois, E. D.

Aug. 13, 1982.

832

JoAnne G. Bloom, Pamela B. Strobel, James B. Burns, Diane Dillon, Larry M. Goldstein, Isham, Lincoln & Beale, Chicago, Ill., for plaintiffs.

Steven A. Miller, Asst. U. S. Atty., Chicago, Ill., Joan M. Wilbon, Atty., U. S. Dept. of Justice, Civ. Div., Federal Programs

Branch, A. Jacy Thurmond, Jr., E. E. O. C., Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Terry Valentine ("Valentine"), a caucasian male agent employed by the United States Department of Justice, Drug Enforcement Administration ("DEA"), brought this reverse discrimination action against the DEA, the Equal Employment Opportunity Commission ("EEOC"), and certain individual officials of those agencies alleging that an affirmative action plan adopted by the DEA in 1979 governing the promotion of Hispanic agents within that agency unlawfully discriminated against him and a class of similarly situated persons.[1] Valentine contends that the affirmative action plan imposes an unlawful quota that discriminates on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, and the Fifth Amendment to the United States Constitution. Valentine also alleges that the process and regulations by which the DEA affirmative action plan was developed and implement-

ed, as set forth in 5 C.F.R. § 713.251 (1976); 5 C.F.R. § 713.601 et seq. (1977–78); and 29 C.F.R. § 1613.601 et seq. (1979–81), violated his rights and the rights of similarly situated members of the purported class to due process of law under the fifth amendment. Valentine seeks declaratory, injunctive and monetary relief for the wrongs alleged in his amended complaint.[2]

Presently before the Court are the EEOC's motion to dismiss Valentine's due process claim for failure to state a claim upon which relief can be granted [Fed.R. Civ.P. 12(b)(6) ],[3] and the DEA's motion for summary judgment on both the due process and Title VII claims [Fed.R.Civ.P. 56]. For the reasons set forth below, the EEOC's motion will be granted and the DEA's motion will be granted in part and denied in part.

## I.

### The Due Process Claim

Valentine alleges that the process and procedures by which the DEA's affirmative action plan was developed in connection with the settlement of a third-party or class complaint filed by Jesse M. Gallegos, a His-

1. Although this matter was originally filed as a class action on March 20, 1980, Valentine has not moved for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure and the case has proceeded through discovery on behalf of Valentine individually. As set forth in his amended complaint, Valentine seeks to represent a class composed of "all non-Hispanic, non-black agents of the DEA who were employed by the DEA at any time during the period from January 1976 to date or are currently employed by the DEA."

2. Valentine initially pursued his discrimination claim administratively as required by section 717 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16. On March 17, 1980, the EEOC Complaints Examiner recommended that Valentine's administrative complaint be rejected because it failed to set forth any description of a resultant personnel action that adversely affected him. On April 4, 1980, the EEOC adopted the findings and recommendation of the Complaints Examiner. Just prior to the EEOC's final action, Valentine filed the instant action in federal court 180 days after he filed his initial charge of discrimination administratively. 42 U.S.C. § 2000e–16(c).

3. Valentine maintains that the EEOC's motion is improperly styled as a motion to dismiss pursuant to Rule 12(b)(6) because it was filed *after* the EEOC answered the complaint. However, courts generally allow motions raising the defense of failure to state a claim even after an answer has been filed if the defense was previously included in the answer filed before the motion. See *Royal Globe Insurance Company v. Logicon, Inc.*, 487 F.Supp. 1245, 1247 n.6 (N.D.Ill.1980); *Jennings Oil Co. v. Mobil Oil Corp.*, 80 F.R.D. 124, 127 (S.D.N.Y.1978); *Sorin v. Board of Education*, 464 F.Supp. 50, 51 (S.D. Ohio 1978); *Majerus v. Walk*, 275 F.Supp. 952 (D.Minn.1967). At most, a motion raising the defense of failure to state a claim filed after an answer raising that defense should be treated as a Rule 12(c) motion for judgment on the pleadings. See *Local No. 1, Broadcast Employers of the International Brotherhood of Teamsters v. International Brotherhood of Teamsters*, 419 F.Supp. 263, 275 n.15 (E.D.Pa.1976). In the case at bar, the EEOC included in its answer the grounds relied upon in support of its motion to dismiss.

panic Special Agent with the DEA, violated established notions of due process under the fifth amendment in that they failed to provide for the notification of non-Hispanic DEA employees whose rights were affected by resolution of Gallegos' complaint or for the intervention of such other employees in the administrative adjudication process.[4] In support of their motions to dismiss and for summary judgment, defendants argue that Valentine's due process attack is barred because section 717 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, is the exclusive remedy for claims of discrimination by federal employees. Defendants maintain that Valentine has failed to articulate a substantive basis for his due process claim independent of his general claim to be free from discrimination in employment on the basis of race or national origin cognizable under Title

VII and that, in the absence of such an independent basis, he is foreclosed from pursuing the due process claim in the instant action.

 It is clear that section 717 provides the exclusive judicial remedy for federal employees who claim they have suffered discrimination on the basis of race, color, religion, sex or national origin. *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Scott v. Perry*, 569 F.2d 1064 (9th Cir. 1978); *I.M.A.G.E. v. EEOC*, 469 F.Supp. 1034, 1036–37 (D.Colo.1979); *Pace v. Mathews*, 15 FEP Cases 703 (D.D.C.1976). Thus, to the extent that Valentine seeks relief under the fifth amendment for alleged discrimination resulting from the adoption of an affirmative action plan in conjunction with the settlement of the Gallegos complaint, *see, e.g.*, Counts I and

4. The affirmative action plan that Valentine seeks to challenge in the instant action was developed and implemented by the DEA in response to a discrimination complaint filed administratively within the agency by Special Agent Jesse M. Gallegos in 1976 pursuant to the procedure set forth at 5 C.F.R. § 713.251 (1976) [now codified at 29 C.F.R. § 1613.601 *et seq.* (1981)]. Gallegos alleged that the DEA had engaged in a pattern or practice of discrimination against Hispanic American Special Agents with respect to promotions to supervisory and policy-making positions within the agency. The complaint was investigated by a Complaint Adjudication Officer who concluded that certain discriminatory practices existed at DEA with respect to Hispanic Special Agents. Accordingly, in order to alleviate what had been identified as the effect of past discrimination within the DEA, a committee was formed to recommend an appropriate remedy. Among other things, the committee was directed to consider the establishment of goals and timetables for the promotion of Hispanics to supervisory and policymaking positions. Eventually, an agreement (hereinafter referred to as the "Gallegos Settlement Agreement") containing the following goals and timetables was adopted by the DEA in response to the Gallegos complaint:

 (A) *supergrade positions*: At present, there are no Hispanic Agents in supergrade positions in DEA. DEA's goal will be to appoint not less than two Hispanic Agents to supergrade positions or positions of a supergrade potential by December 31, 1980.

 (B) *GS–15*: At present, there are five Hispanic Agents of a total of 101 in GS–15 grade positions. In addition to the current number,

DEA's goal will be to promote not less than two Hispanic Agents to GS–15 by Dec. 31, 1979 and not less than three additional Hispanic Agents to that grade by Dec. 31, 1980.

 (C) *GS–14*: At present, there are 19 Hispanic Agents in GS–14 grade positions out of a total of 298. In addition to the current number, DEA's goal is to promote not less than four Hispanic Agents to GS–14 positions by Dec. 31, 1979, an additional four Hispanic Agents by Dec. 31, 1980 and an additional three Hispanic Agents by Dec. 31, 1981.

 (D) *GS–13*: At present, there are 32 Hispanic Agents at the GS–13 level out of a total of 557. In addition to the current number, DEA will promote not less than eight Hispanic Agents to GS–13 by December 31, 1979, not less than eight Hispanic Agents by December 31, 1980, and not less than an additional six Hispanic Agents to that grade by Dec. 31, 1981 or to insure that Hispanic Agents represent a minimum of 20% of promotions made to GS–13s each year until December 31, 1981.

In addition, the agreement provided that:

 the attainment of goals is dependent on the total number of promotional possibilities that became available during the time period of this agreement and that all personnel actions under this agreement will be made in accordance with merit system regulations. The parties further recognize that the number of promotions of Hispanics under this section of the agreement will not be to the exclusion of promotional opportunities for non-Hispanic Agents.

Gallegos Settlement Agreement at ¶ I.E.

III of the Amended Complaint, the Court concludes that those claims are duplicative of his Title VII claim and are barred in view of the exclusive section 717 remedy under the Civil Rights Act.

Valentine maintains, however, that he has stated a due process claim under the fifth amendment that is separate and distinct from his Title VII claim with the allegation that he was denied notice of and an opportunity to intervene in the third-party complaint filed by Jesse Gallegos which eventually yielded the DEA goals and timetables for the promotion of Hispanic agents that are challenged in the instant case. *See, e.g.,* Count II of the Amended Complaint. But certain passages in Valentine's briefs belie his attempt to carve out a separate cause of action under the fifth amendment apart from his Title VII discrimination claim. For example, in his brief in opposition to the EEOC's motion to dismiss, Valentine states:

> [t]he EEOC argues that the plaintiffs' claim for relief based on the fifth amendment must fail for lack of a protectible property or liberty interest. On the contrary, *plaintiff and his class are attempting to protect their legitimate, clear-cut rights to discrimination-free employment,* including promotion, rights indisputably within the ambit of the fifth amendment.
>
> \* \* \* \* \* \*
>
> [i]t is the deprivation of employment opportunity for which plaintiffs seek relief under the fifth amendment.

Valentine's Brief in Opposition to EEOC Motion at 7, 11 (emphasis supplied). In response to the DEA's argument that his due process claim is inseparable from his Title VII claim and is thus merged into that claim under the rationale of *Brown v. GSA, supra,* and subsequent cases, Valentine states:

> [B]ecause of the DEA's resolution of Gallegos' complaint, apparently without involvement of [sic] effective consideration of the Plaintiffs' rights, a given number of available positions is reserved for Hispanics, thereby eliminating from competition non-Hispanic agents who

otherwise would qualify for the positions. *It is this deprivation of employment opportunity for which Plaintiffs seek redress under the fifth amendment.*

Valentine's Brief in Opposition to DEA's Motion at 16–17 (emphasis supplied). It is thus apparent that Valentine's argument in support of his purported due process claim is identical to his Title VII claim which, as discussed above, is his exclusive remedy for employment discrimination.

 Furthermore, as the Seventh Circuit noted recently in *Shango (Cleve Heidelberg, Jr.) v. Jurich,* 681 F.2d 1091 (7th Cir. 1982), the mere existence of a particular procedure, without more, does not create any substantive liberty or property interest so that the failure to make the procedure available in a particular case does not constitute a deprivation of constitutional magnitude. A plaintiff must first identify a substantive liberty or property interest before she or he can demand procedural due process protection for that interest. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is only after the existence of a protected interest has been established that a court must ascertain the procedural due process protections that attach by balancing the private and public interests involved. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

 In the instant case, Valentine has not identified a liberty or property interest that would allow him to participate in administrative adjudications of third-party or class complaints to which he is not otherwise a party. The class complaint procedure itself does not create any protectible interest, and any interest that Valentine may have in being promoted within the DEA according to non-discriminatory criteria would not encompass the right to intervene in administrative adjudications involving discrimination claims of other DEA employees. Moreover, we strongly suspect that any protectible interest that Valentine would be able to establish with respect to DEA promotional policies and practices would be adequately served by the adminis-

trative adjudication and review process and subsequent civil action under Title VII available to him, as amply demonstrated in the route travelled by the case at bar.

## II.

### The Title VII Claim

As a threshold matter, defendants challenge Valentine's standing to pursue his Title VII claim because, although he admittedly applied for a number of promotions within the DEA, he never was placed on the "best qualified" list, which is supposedly compiled on the basis of objective criteria unrelated to race or national origin, from which the persons who were eventually selected in his stead were drawn. Thus, defendants contend that even in the absence of the allegedly discriminatory affirmative action plan that arose out of the settlement of the Gallegos complaint,[5] Valentine would not have been promoted. They argue that Valentine has not satisfied the constitutional dimension of the standing requirement in that his claimed injury (the denial of a promotion) is not causally related to the challenged conduct (the allegedly unlawful affirmative action plan) and that his injury is not likely to be redressed by a favorable decision of his claim. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37–38, 96 S.Ct. 1917, 1923–24, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *See also Peoples Gas, Light & Coke Co. v. United States Postal Service*, 658 F.2d 1182 (7th Cir. 1981). Valentine vigorously contends that he does have standing to pursue his Title VII claim and that, at the very least, material factual disputes on that issue preclude summary judgment as a matter of law at this stage of the proceedings.

■ If it were clear that Valentine failed to meet objective, nondiscriminatory criteria as a prerequisite to being allowed to compete for a promotion, we would have no trouble holding that he lacked standing to complain of allegedly discriminatory criteria that are only applied to those who meet the threshold eligibility requirement. A number of courts have reached that conclusion under similar circumstances. *See, e.g., Howard v. New Jersey Department of Civil Service*, 667 F.2d 1099 (3d Cir. 1981); *Doherty v. Rutgers School of Law-Newark*, 651 F.2d 893 (3d Cir. 1981); *McAdams v. Regents of University of Minnesota*, 508 F.Supp. 354 (D.Minn.1981). In our view, *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), is not to the contrary. In that case, neither the University nor Bakke could prove that he would or would not have been admitted to the University in the absence of the special admissions program at issue there. It was in that context that the Supreme Court stated that, because the question was so close, it could not be said that Bakke's alleged injury was not likely to be redressed by a favorable decision of his claim and, thus, that he possessed standing to challenge the University's admissions policies. 438 U.S. 281 n.14, 98 S.Ct. at 2743 n.14. Justice Powell did go on to note that Bakke would have standing "even if [he] had been unable to prove that he would have been admitted in the absence of the special program" because the trial court had found that he had been injured by the University's decision not to allow him to compete for all the available spaces in the entering class "simply because of his race." *Id.* That statement, however, must be read in the context of the facts in that particular case and not as an abandonment of settled principles of standing and justiciability previously articulated by the Supreme Court. *See Doherty v. Rutgers School of Law-Newark, supra*, 651 F.2d at 901–02. Clearly, if the University's decision not to allow him to compete for all the available spaces was based upon objective, non-discriminatory criteria, *Bakke* would have turned out differently.

---

**5.** *See* note 4, *supra.*

In the case at bar, Valentine does not dispute the fact that the promotions for which he applied within the DEA were ultimately given to persons who were on the "best qualified" list nor does he dispute that he was never placed on that list. He does contend, however, that if the best qualified list was composed with reference to the allegedly unlawful goals and timetables in the affirmative action plan, then he has standing to challenge the plan because his injury stems, at least in part, from the challenged conduct and that injury is likely to be redressed by a favorable decision of his claim. At the very least, Valentine argues that material questions regarding the use of the goals and timetables for promotion of Hispanic agents in the selection process and their relationship to the composition of the best qualified list preclude summary judgment on that issue at this juncture.

The best qualified list is compiled in accordance with the "merit promotion plan" contained in the DEA Administrative Manual ("DEA Manual"). *See* DEA Manual at ¶ 0633.1 *et seq.* (Mar. 13, 1980). Initially, candidates for promotion are screened for certain minimum qualifications for the particular position to be filled. The applicants are also rated numerically along a sliding scale through the application of a combination of objective and subjective criteria such as breadth and type of experience, special skills such as proficiency in a second language, education and training, and supervisory performance ratings and evaluation of potential. DEA Manual at ¶ 0633.42 (Mar. 13, 1980). The qualifications of the basically eligible candidates are compared against predetermined job-related criteria [6] that have been established for the specific job to be filled in order to identify the "highly qualified" candidates. DEA Manual at ¶ 0633.42(D)(6)(c) (Mar. 13, 1980). The highly qualified candidates are then subjected to a "ranking process" in order to determine the "best qualified." According to the DEA Manual, the ranking process consists of

> a comparison of the 'highly qualified' candidates with each other to determine if there are *any further qualitative distinctions* among the 'highly qualified.' Those who clearly stand out above the rest of the 'highly qualified' are the 'best qualified.'

DEA Manual at ¶ 0633.42(D)(6)(d) (Mar. 13, 1980) (emphasis supplied). A "reasonable number" of the highly qualified candidates are placed on the best qualified list that is submitted to the selecting official. DEA Manual at ¶ 0633.22(F)(1) (Mar. 13, 1980). According to the data in Defendants' Exhibit H, anywhere from five to thirteen names were placed on the best qualified lists for the promotions sought by Valentine. Valentine maintains that he was not placed on the best qualified list, in part, because of his race or national origin and that he was thus denied the opportunity to compete for promotion on an equal basis with Hispanics.

Although defendants argue that the goals and timetables for the promotion of Hispanic agents contained in the affirmative action plan attributable to the settlement of the Gallegos' class complaint do not come into play until the best qualified candidates are selected on the basis of racially and ethnically neutral criteria, neither the settlement agreement itself nor the merit promotion process set forth in the DEA Manual necessarily compel that conclusion. By entering into the Gallegos settlement agreement, the DEA broadly committed itself to achieve the goals set forth in section I of the agreement "in accordance with merit system regulations" which admittedly declare·as a policy that promotions be made without regard to race or national origin. DEA Manual at ¶ 0633.13(C) (Mar. 13, 1980). The settlement agreement, however, necessarily requires that race and ethnicity play some role in the promotion process at least

---

6. Job-related criteria "go beyond the minimum standards for basic eligibility and are expressed in terms of specific skills, knowledges, abilities and personal characteristics (SKAP) that an employee should possess to be highly successful in the position." Manual at ¶ 0633.42(C)(3) (Mar. 13, 1980).

insofar as Hispanic agents are concerned. In that vein, for example, section II of the agreement entitled "Hispanic Agents Eligible For Promotion" refers to those Hispanic agents who had previously been placed on a best qualified list without being promoted (Appendix A) as well as to other Hispanic agents who are said to be "eligible for promotion" solely by virtue of their having served in the same civil service grade for three years (Appendix B).[7]

In addition, the rating and ranking process set forth in the DEA Manual by which minimally qualified candidates are rated and ranked until the best qualified are identified is, arguably, on the record before us at the present time, not a completely objective process. The more subjective aspects of that process, such as the supervisors' performance evaluations and the division of the highly qualified into the best qualified apparently based, in part, on "qualitative distinctions" among the applicants, DEA Manual at ¶ 0633.42(D)(6)(d) (Mar. 13, 1980), could conceivably accommodate some implicit consideration of race or national origin with particular reference to the goals and timetables in the affirmative action plan.[8] We emphasize that we do not decide here that race or national origin is necessar-ily considered in the process of compiling the best qualified list. Rather, we note only that on the record before us, such a possibility exists and that the existence of that possibility precludes summary judgment at this juncture.

■ Accordingly, viewing the evidence in the light most favorable to Valentine, the non-moving party, as we are required to do in the context of a motion for summary judgment,[9] we cannot say that there is absolutely no connection between the allegedly unlawful goals and timetables in the affirmative action plan and the composition of the best qualified list from which successful candidates for promotions are drawn. There remains a material factual dispute as to whether the procedures used to choose agents for promotion within the DEA preclude Valentine from competing for promotional opportunities within that agency on an equal basis with Hispanic agents by reason of the goals and timetables established as a consequence of the Gallegos settlement. In light of that dispute, we cannot say that Valentine lacks standing to challenge those goals and timetables. *Regents of the University of California v. Bakke, supra,* 98 S.Ct. at 2743 n.14. This case is thus distinguishable from oth-

---

7. We do not mean to suggest that any of the Hispanic agents listed in Appendices "A" or "B" necessarily would be given preferential treatment under the Gallegos settlement agreement. Indeed, the agreement expressly states that "[t]here are no guarantees that any one or all of these Agents will be promoted under the terms of this proposal for relief." Gallegos Settlement Agreement at ¶ II. Rather, we mention the listing of "Hispanic Agents Eligible For Promotion" only to illustrate that the settlement agreement contains no inherent limitation on its application to the process of choosing among the best qualified candidates once they are chosen from among the broader applicant pool. The listing of all Hispanic agents who have been rated best qualified as well as those who are merely basically eligible for promotion creates at least some question with respect to the intended scope and applicability of the affirmative action process.

8. The record shows that Valentine applied for at least nine promotions during the relevant time period. Defendants' Exhibit H. On several occasions, Valentine's score was between three and six points below the scores of those ten or eleven candidates who made the best qualified list. There is no indication as to whether Valentine would have made the best qualified list on those occasions if, for example, one, two or three more names had been placed on the list as had been done on other occasions. There is also no explanation as to why the best qualified cut-off was set at one point on one occasion and at another point on another occasion.

9. In the context of a motion for summary judgment, it is the *moving party* who bears the burden of showing that there is no dispute as to any genuine issue of fact material to a judgment in its favor as a matter of law. *Cedillo v. International Association of Bridge & Structural Iron Workers, Local No. 1,* 603 F.2d 7, 10 (7th Cir. 1979). The non-moving party is entitled to all reasonable inferences that can be made in its favor from the evidence in the record. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Moutoux v. Gulling Auto Electric,* 295 F.2d 573, 576 (7th Cir. 1961).

ers in which there was a clear distinction drawn between the challenged aspects of a screening or application process that allegedly discriminated on the basis of a suspect criteria and those other, preliminary classifications that are based solely on objective, neutral factors. *See, e.g., Howard v. New Jersey Department of Civil Service, supra; Doherty v. Rutgers School of Law-Newark, supra.*[10] Cf. *Jurgens v. Norton*, 22 FEP Cases 1738, 1739 (N.D.Tex.1980) (in class certification context, court notes that sparsity of the evidence at that stage of the litigation renders premature any assumption that the process by which one attains the status of being "highly qualified" is not tainted by the EEOC's affirmative action plan).

Defendants also contend that even if Valentine has standing to assert a Title VII claim, he has not established a prima facie case of discrimination based on race or national origin. Furthermore, even assuming Valentine's standing *and* the existence of a prima facie case, defendants argue that he has not adequately rebutted their proffer of a legitimate, non-discriminatory reason for their actions and that they are thus entitled to judgment as a matter of law on the Title VII claim. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Defendants' argument with respect to Valentine's asserted failure to establish a prima facie case is that he has not shown that he was among the best qualified candidates for the positions he sought. How-

ever, this argument is essentially the same as defendants' attack on Valentine's standing to prosecute this action in the first instance. As discussed above, there appears to be a material factual dispute at this stage of the proceedings as to whether Valentine's failure to be placed on the best qualified list was due, in any material part, to his race or national origin. There is no evidence in the record with respect to Valentine's relative qualifications as compared to other candidates aside from the issue of the best qualified list. Moreover, in the present posture of this case, the issue is not only whether Valentine would have been promoted in the absence of the allegedly unlawful affirmative action plan, but also whether he was denied the right to compete for those promotions by reason of the goals and timetables contained in the plan. Whether or not Valentine actually would have been promoted but for the existence of the affirmative action plan merely goes to the issue of relief. *See Regents of the University of California v. Bakke, supra*, 438 U.S. at 281 n.14, 98 S.Ct. at 2743 n.14.

Defendants also contend that the goals and timetables established as a consequence of the Gallegos settlement constitute a legitimate, non-discriminatory means of remedying past discrimination against Hispanics by the DEA so as to adequately rebut any inference of reverse discrimination that might be raised by Valentine even if he were able to establish a prima facie case. They maintain that the affirmative action plan at issue here was adopted only after the DEA determined, following an appropriate investigation, that its prior practices

---

10. For example, in *Howard*, the plaintiffs, both of whom were women, had applied for positions as police officers with the Newark Police Department. The application process contained two separate stages: a written civil service examination and a physical agility or medical examination. The court held that since both plaintiffs had failed the written exam, they lacked standing to challenge the physical agility or medical examination. As the court stated, "there is no causal connection between the claimed injury (loss of job opportunity) and the challenged conduct (use of the physical agility test)." 667 F.2d at 1101. Similarly, in *Doherty*, the plaintiff, an unsuccessful appli-

cant to Rutgers School of Law-Newark, challenged the school's policy of reserving thirty percent of the entering class for minority or disadvantaged applicants. The court found that the plaintiff lacked standing because he would not have been admitted to the school even in the absence of the minority admissions program. The court reasoned that Doherty's objective qualifications, measured by his LSAT score and undergraduate GPA, were too low for admission even if he received the maximum number of points in the subjective phase of the admissions process, which included consideration of the applicant's race. 651 F.2d at 900.

and policies had the effect of discriminating against Hispanics in violation of Title VII and that the goals and timetables for the promotion of Hispanic agents constituted an acceptable means of remedying such past discrimination in a manner that is reasonably related to the legitimate objective of achieving equal opportunity in employment consistent with the Supreme Court's approach in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *United Steel Workers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); and *Regents of the University of California v. Bakke, supra.*

 Unfortunately, neither the Supreme Court nor the Seventh Circuit has had the occasion to definitively determine the appropriate standard of review or the proper degree of deference to be accorded to a voluntary affirmative action plan adopted by a public or private employer in the context of a reverse discrimination challenge to the plan, and the parties have not addressed this issue in any detail in their briefs directed at the pending motions in the case at bar. *Compare* Justice Powell's concurring opinions in *Fullilove v. Klutznick, supra, and Regents of the University of California v. Bakke, supra,* with Justice Brennan's opinion for the Court in *United Steel Workers of America v. Weber, supra. See also Lehman v. Yellow Freight System, Inc.,* 651 F.2d 520, 528 n.17 (7th Cir. 1981). It is clear from the opinions of the Supreme Court as well as those of the lower courts that a voluntary affirmative action plan including goals and timetables for the hiring or promotion of minorities will be upheld when there has been a competent finding that the employer has engaged in discrimination in the past and the goals or timetables adopted are reasonably related to remedying the effects of that prior discrimination. Whether a particular employer has, in fact, engaged in discrimination in the past directed against a particular segment of the population and whether the proposed remedy for that discrimination is narrowly tailored to redress only the effects of such prior discrimination without infringing upon the rights of innocent parties are questions that must be determined on a case by case basis. *See generally Detroit Police Officers Association v. Young,* 608 F.2d 671 (6th Cir. 1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981); *Jurgens v. Norton,* 22 FEP Cases 1738 (N.D.Tex.1980); *Baker v. City of Detroit,* 483 F.Supp. 930 (E.D.Mich.1979); *Tangren v. Wackenhut Services, Inc.,* 480 F.Supp. 539 (D.Nev.1979); 2 Larson, *Employment Discrimination* §§ 57.00–57.68 (1981 ed.).

In the case at bar, Valentine contends that the goals and timetables in the DEA affirmative action plan were adopted without a competent threshold determination that the agency had discriminated against Hispanic Americans in the past. For example, Valentine cites statistics to show that during the relevant time period, Hispanics were over-represented at the supervisory levels within the DEA compared to their general representation in the U. S. work force. Valentine also contends that the actual findings of past discrimination against Hispanics that were made by the DEA Complaint Adjudication Officer who investigated the matter were quite limited in scope, focusing exclusively on the disproportionate number of undercover assignments and geographic transfers given to Hispanic agents. As a result of the discrimination in assignments and transfers, Hispanics were not able to accumulate the varied experience of their white counterparts, and they were prejudiced in the rating and ranking process for promotions. Valentine argues that in light of the actual findings of past discriminatory practices detailed in the decision of the Complaint Adjudication Officer, the affirmative remedy adopted by the DEA should have been more narrowly tailored and limited so as to give Hispanic agents the type and breadth of experience afforded their white or Anglo counterparts in order to make them equally qualified for promotion and that the goals and timetables established for promotion were unnecessary to remedy the effects of the past discrimination shown.

As the parties have not addressed in any detail the matter of the appropriate standard of review or proper degree of deference to be accorded the voluntary affirmative action plan adopted by the DEA consistent with the principles enunciated in the cases cited above, the Court believes that any ruling on the validity of the plan at issue here would be premature. The Court is not convinced on the present record by the DEA's argument that its efforts under the voluntary affirmative action here at issue should be judged under the same standard as would be applicable in the context of an affirmative action plan mandated by a court order or court-approved consent decree. *See, e.g., McAleer v. American Telephone & Telegraph Co.*, 12 EPD ¶ 10,994 (D.D.C.1976).

Furthermore, as discussed at length in section II of this opinion, *supra*, the present record is sparse at some points and susceptible of conflicting interpretations at others so that summary judgment, if it would ever be warranted in this case, has been frustrated for the time being. As discovery apparently has been proceeding during the pendency of these motions and while the parties engaged in extensive though ultimately fruitless settlement negotiations, both sides should have an opportunity to at least attempt to clarify those gray areas identified in our preceding discussion and, if appropriate, file another round of motions for summary judgment on the merits. For instance, with respect to the standing issue discussed above, it would be useful to clarify the precise role, if any, that the goals and timetables set forth in the affirmative action play in the process of compiling the best qualified list for purposes of promotion within the DEA. As the Court indicated above, the present record is a bit murky at best with regard to the interrelationship of the objective and more subjective factors considered during that process. With respect to the merits of the affirmative action plan itself, it would be useful to know whether the goals and timetables are still in effect or whether that portion of the plan has terminated. In addition, a more complete record must be made on the DEA's contention that the affirmative action plan was necessary in order to remedy the effects of past discrimination. Although the decision of the Complaint Adjudication Officer on this issue is a part of the record, the exhibits referred to and relied upon in connection with that decision are not. In the Court's view, this information as well as any other relevant data in the parties' possession not specifically mentioned herein, should be in the record in order to permit an informed ruling on the merits based on a solid record that would be useful to this Court as well as for purposes of an eventual appeal, should that occur.

Accordingly, the EEOC's motion to dismiss is granted and the DEA's motion for summary judgment is granted in part and denied in part. The parties shall appear for a status hearing in this case at 10:30 a. m. on August 27, 1982, after they have had an opportunity to review this opinion. At that time, they shall inform the Court as to the need for any additional discovery and an appropriate timetable will be set for resolution of this matter by summary judgment or trial. It is so ordered.