924 F.2d 741
 NOR-WEST CABLE COMMUNICATIONS PARTNERSHIP, a general
partnership, Appellant,
v.
CITY OF ST. PAUL, a City of the First Class, Appellee,
and
Continental Cablevision of St. Paul, Inc.,
Intervenor-Defendant Below, Appellee.
 No. 89-5184.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 14, 1990.
Decided Jan. 25, 1991.
 
 Harold R. Farrow, Walnut Creek, Cal., for appellant.
 Earnest I. Reveal, St. Paul, Minn., for City of St. Paul.
 Gardiner Gillespie, Washington, D.C., for Continental Cablevision.
 Before McMILLIAN and ARNOLD, Circuit Judges, and HEANEY, Senior Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 Nor-West Cable Communications Partnership ("Nor-West") appeals a judgment of the United States District Court for the District of Minnesota.[1] See Nor-West Cable Communications Partnership v. City of St. Paul, No. 3-83-Civ. 1228 (D.Minn. Sept. 1, 1988) (order for judgment) (Nor-West I ). On appeal, Nor-West argues that the district court erred in upholding the jury's answers to various "special verdict" questions and in denying Nor-West's motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. For the reasons stated below, we affirm.
 
 I. Facts
 
 2
 In 1979, the City of St. Paul, Minnesota, issued a "request for proposals" (RFP) to companies interested in providing a cable television service to St. Paul. Although several companies filed proposals, the City decided to operate its own cable system. After the City's "municipal ownership" plan was rejected in a referendum, the St. Paul City Council voted to award a single, non-exclusive franchise to a private cable operator, and a new RFP was issued. Numerous companies filed proposals, including Continental Cablevision of St. Paul, Inc. ("Continental"), and Nor-West. The City Council passed a resolution awarding the franchise to Nor-West, but the Mayor of St. Paul vetoed the resolution, and the City Council then awarded the franchise to Continental. This decision was affirmed by the Minnesota Cable Communications Board and by the Minnesota Supreme Court. See Cable Communications Board v. Nor-West Cable Communications Partnership, 356 N.W.2d 658 (Minn.1984).
 
 
 3
 On September 2, 1983, Nor-West filed the present lawsuit against Continental and the City (collectively "defendants"), alleging violations of due process, equal protection, the first amendment, and the Sherman Antitrust Act, 15 U.S.C. Secs. 1, 2 (1988), as well as pendent state claims. Shortly thereafter, Nor-West's counsel requested that the City award a second, competing franchise to Nor-West. Defendants moved to dismiss, and the district court granted the motion. We reversed and remanded, ordering the district court to reconsider Nor-West's claims in light of a recent Supreme Court case. See Nor-West Cable Communications v. City of St. Paul, 802 F.2d 462 (8th Cir.1986) (unpublished) (reversing and remanding case to district court), citing City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) (requiring "thoroughly developed record" in first amendment cases).
 
 
 4
 On remand, the district court proceeded to trial on Nor-West's first amendment and equal protection claims, and dismissed Nor-West's other claims. After an eight-week trial, the district court submitted the case to the jury on special verdicts. The jury found that Nor-West spent $265,000.00 in seeking the cable television franchise, but also found that Nor-West was never willing, nor technically or financially able to build a competitive cable system, and that it was therefore not damaged by the City's failure to award it a second cable franchise.
 
 
 5
 In Nor-West I, the district court adopted the jury's factual findings, holding that it was both "bound [and] ... chooses to be bound by the jury's findings." Slip op. at 6. Specifically, the district court held, based on Special Verdicts Nos. 5-7, id. at 11, that Nor-West was not willing or able to build a competitive cable system. The district court went on to hold that because Nor-West was unwilling and unable to compete, it lacked standing to challenge Continental's cable monopoly. The district court further held that Nor-West was not entitled to damages for its expenditures in pursuit of the cable monopoly, because "unsuccessful bidders are not entitled to recover damages." Id. at 9. The district court also dismissed Continental as a defendant, on the basis that "[n]o injunctive or monetary relief was sought from Continental." Id. at 1 n. 1.
 
 
 6
 Nor-West then moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The district court denied Nor-West's motion. See Nor-West Cable Communications Partnership v. City of St. Paul, No. 3-83-Civ. 1228 (D.Minn. Feb. 27, 1989) (order) (Nor-West II ). This appeal followed.
 
 II. Issues
 
 7
 On appeal, Nor-West contends that: (1) the district court erred in holding that Nor-West lacked standing to sue, (2) even if Nor-West lacked standing to challenge the City's refusal to grant a competitive franchise, it had standing to request damages for the $265,000.00 it spent in pursuit of a cable monopoly, (3) the district court's pre-trial discovery order erroneously limited Nor-West's right to present expert witnesses, (4) the district court submitted numerous erroneous instructions and special verdicts to the jury, (5) the district court erroneously excluded certain evidence, and (6) that if damages should have been awarded against the City, Continental should also be liable for damages. Each of these arguments will be addressed in turn.
 
 A. Standing
 
 8
 The jury answered Special Verdicts Nos. 1-3 and Nos. 5-7 as follows:
 
 
 9
 1. Did Nor-West have the financial ability necessary to design, construct and operate the cable television system which Nor-West requested permission to build after August 2, 1983, in competition with Continental Cablevision in St. Paul?
 
 NO
 
 10
 2. Was Nor-West capable of obtaining and providing the technical capability necessary to design, construct and operate the cable television system which Nor-West requested permission to build after August 2, 1983, in competition with Continental Cablevision in St. Paul?
 
 NO
 
 11
 3. If Nor-West had been given the opportunity to build the cable television system it requested permission to build after August 2, 1983, in competition with Continental Cablevision, would Nor-West have built the system?
 
 NO
 
 12
 5. At this time, does Nor-West have the financial ability necessary to design, construct and operate the cable television system it has requested permission to build in competition with Continental Cablevision in St. Paul?
 
 NO
 
 13
 6. At this time, is Nor-West capable of obtaining and providing the technical capability necessary to design, construct and operate the cable television system it has requested permission to build in competition with Continental Cablevision in St. Paul?
 
 NO
 
 14
 7. If Nor-West were given the opportunity at this time to build the cable television system it has requested permission to build in competition with Continental Cablevision in St. Paul, would Nor-West build such a system?
 
 NO
 
 15
 Nor-West I, slip op. at 1-2. After trial, Nor-West asserted that the jury's answers were merely advisory. The district court rejected this view, holding that "the court is bound by the jury's findings. Further, the court chooses to be bound by the jury's findings." Id. at 6. Based on the jury's findings that Nor-West was not "ready, willing and able to operate a [competitive] cable television system," id. at 8, the district court held that Nor-West did not have standing to sue. In denying Nor-West's motion for judgment n.o.v. or a new trial, the district court reiterated its view that Nor-West lacked standing. See Nor-West II, slip op. at 4-9.
 
 
 16
 On appeal, Nor-West argues that (1) the district court failed to independently review the jury's findings, (2) we must review the district court's findings de novo, (3) the district court erred in finding that Nor-West was neither able nor willing to build or operate a competitive cable system, (4) Nor-West has standing because it was denied the opportunity to compete, even if it were neither able nor willing to do so, (5) post-trial determinations of standing are impermissible, and (6) even if Nor-West has suffered no injury itself, it has standing to sue on behalf of St. Paul cable television consumers, who were allegedly injured by the absence of competition in St. Paul. Each of these issues will be addressed below.
 
 1. District Court Review of Jury Findings
 
 17
 Where a case has been submitted to the jury on special verdicts pursuant to Fed.R.Civ.P. 49(a), the jury's findings are usually binding on the district court unless they are against the weight of the evidence. See, e.g., Ryan v. McDonough Power Equipment, Inc., 734 F.2d 385, 388 (8th Cir.1984) (affirming district court rejection of jury's special verdict as "against the great weight of the evidence"). Nor-West contends, however, that in cases involving the first amendment, the district court must review the jury's findings de novo and failed to do so in the present case.
 
 
 18
 In support of the first proposition, Nor-West relies on the case of Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (Bose ). In Bose, the defendant allegedly made false statements about loudspeakers manufactured by the plaintiff, and the plaintiff filed suit for product disparagement. The district court entered judgment for the plaintiff after a bench trial, holding that the plaintiff had proven, inter alia, that the defendant had published its statements with "actual malice."[2] The First Circuit reversed, holding that its review of the district court's "actual malice" determination was not limited to the "clearly erroneous" standard traditionally governing factual determinations in bench trials. The Supreme Court agreed, holding that:
 
 
 19
 the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a determination of actual malice.... Appellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.
 
 
 20
 Id. at 514, 104 S.Ct. at 1967. Thus, Bose stands for the proposition that appellate courts must review a district court's finding of "actual malice" de novo. This rule also applies to other "cases involving restriction on the freedom of speech protected by the First Amendment, particularly in those cases in which it is contended that the communication in issue is within one of the few classes of 'unprotected' speech," id. at 503, 104 S.Ct. at 1961, even if relevant issues were resolved by a jury rather than a judge. Id. at 508-09 n. 27, 104 S.Ct. at 1964 n. 27.
 
 
 21
 Nor-West argues that Bose required the district court "to independently review the evidence on dispositive constitutional facts." Brief for Appellant at 33. Although Bose requires special scrutiny of jury verdicts, 466 U.S. at 510 n. 29, 104 S.Ct. at 1965 n. 29, it does not suggest that the district court rather than the court of appeals should review such verdicts de novo. Thus, Nor-West's argument is incorrect, and we find that the district court was not required to review the jury's special verdict answers de novo.[3]
 
 2. Standard of Review on Appeal
 
 22
 As a rule, factual determinations relating to standing must be upheld on appeal unless they are clearly erroneous. See Pulido v. Bennett, 848 F.2d 880, 888 (8th Cir.), rev'd on other grounds on rehearing, 860 F.2d 296 (8th Cir.1988); see also Hope, Inc. v. County of DuPage, 738 F.2d 797, 803 (7th Cir.1984) (applying "clearly erroneous" rule to standing determination in case involving fourteenth amendment claim). On the other hand, it could be argued that Bose requires de novo review where, as here, the plaintiff's substantive claim arises under the first amendment.
 
 
 23
 Indeed, Bose clearly holds that certain first amendment issues in addition to "actual malice" must be reviewed de novo on appeal. See Bose, 466 U.S. at 504-08, 104 S.Ct. at 1961-64 (requiring independent review as to whether speech falls in "unprotected category" such as fighting words, incitement of lawless action, obscenity, and child pornography). See also Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 109 S.Ct. 2678, 2695, 105 L.Ed.2d 562 (1989) (applying Bose to libel action) (Harte-Hanks ); Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963) (requiring independent review as to whether an alleged breach of the peace protected by first amendment); Lebron v. Washington Metropolitan Area Transit Authority, 749 F.2d 893, 897 (D.C.Cir.1984) (requiring independent review as to whether speech deceptive and therefore unprotected).
 
 
 24
 However, Bose and similar cases involve substantive determinations as to whether the plaintiff's speech is protected by the first amendment. By contrast, the district court's factual determinations in this case involve the procedural issue of standing. Accordingly, we hold that Bose is distinguishable and find that even in a first amendment case, factual determinations related to standing should be reviewed under the "clearly erroneous" standard.
 
 
 25
 3. Were the District Court's Findings Clearly Erroneous?
 
 
 26
 Nor-West next argues that the district court's findings were clearly erroneous as to whether Nor-West is or was financially able to build a competitive cable system, intends to build a competitive system, and is or was technically able to do so.
 
 
 27
 a. Financial Ability
 
 
 28
 Nor-West argues that it is (and was in 1983) capable of financing a competitive cable system and that the district court's holding to the contrary was clearly erroneous. Nor-West notes that its partners had a combined net worth of $76 million, including $10 million in cash. Although some of Nor-West's partners have dropped out, Nor-West's net worth is still $31 million, and one of Nor-West's partners "testified he could obtain a loan commitment if Nor-West were given a [competitive] franchise." Brief of Appellant at 19. Nor-West also notes that banks in other cities have been willing to finance cable systems and that it could build a system even more cheaply if the City allowed it to build a smaller system than that mandated by the City's RFP.
 
 
 29
 On the other hand, the City notes that Nor-West's original financing commitment lapsed in 1983 and that Nor-West has not yet obtained a financing commitment for a competitive cable system. The City's expert testified that Nor-West would not have obtained a loan commitment even if "Nor-West had a connection with a major cable company or if the partnership had substantial personal assets," Brief of Appellee City of St. Paul at 12 n. 21 ("City Brief"). The City also relies on the testimony of Henry Harris, whose cable company (Metrovision) had originally contracted to operate a cable system for Nor-West. Harris testified that he would not be interested in operating a competitive cable system in St. Paul because such a project would be as "doomed to failure no matter how good a management you threw at me" and likened the operation of a competitive system to being "lead pilot in a Kamikaze plane." Id. at 13. Finally, numerous experts testified that "there was insufficient demand for cable television in St. Paul to sustain more than one operator," id. at 13, and that Nor-West would have lost money. Id. at 14. In response, Nor-West's experts testified that it could compete with Continental head-to-head.
 
 
 30
 Based upon our review of the evidence, we find that even if Nor-West had been able to obtain a bank loan to finance a competitive cable system, reasonable people could disagree as to whether it would have been able to operate a competitive system profitably. Accordingly, we hold that the district court's finding that Nor-West was never financially able to compete with Continental was not clearly erroneous.
 
 
 31
 b. Intent
 
 
 32
 Nor-West also contests the jury's findings that it never intended to build a second cable system in St. Paul. Nor-West contends that its expenditure of over $1.5 million in this litigation proves that it intended to build a competitive cable system, Brief of Appellant at 35 n. 106. On the other hand, the City notes that the Nor-West partners did not investigate the possibility of building a competitive system until the present litigation began, and that the partners were "unable to articulate what Nor-West was ready, willing and able to build." Brief for Appellee City of St. Paul at 11.
 
 
 33
 Reasonable people could disagree as to the credibility of Nor-West's partners' testimony that they intended to build a competitive cable system. Accordingly, we hold that the district court's finding that Nor-West "never intended to design, construct, and operate a cable television system in St. Paul," Nor-West I, slip op. at 7, was not clearly erroneous. See Harte-Hanks, 109 S.Ct. at 2696 (even in first amendment cases, credibility determinations are reviewable under the clearly erroneous standard). We therefore need not address the question of whether Nor-West had the technical capacity to build a competitive cable system in St. Paul.
 
 
 34
 4. Do Financial Capability and Intent Matter?
 
 
 35
 Nor-West next argues that even if it lacked either the financial capability or the intent to compete with Continental, it has standing to sue, because "[i]t has been denied the opportunity to speak and publish. That denial alone is a judicially recognized injury." Brief for Appellant at 30 (emphasis in original). In support of this view, Nor-West relies primarily on the cases of City of Arlington Heights v. Metropolitan Housing Development Corp, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (Arlington Heights ) and Regents of University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Bakke ).[4]
 
 
 36
 In Bakke, the plaintiff, an unsuccessful white applicant to a medical school, challenged a "special admissions" program setting aside 16 of 100 places for nonwhite applicants. 438 U.S. at 275, 98 S.Ct. at 2740. Several amici alleged that the plaintiff lacked standing, "arguing that he never showed that his injury--exclusion from the Medical School--will be redressed by a favorable decision." Id. at 280-81 n. 14, 98 S.Ct. at 2743 n. 14. The Supreme Court disagreed, holding that:
 
 
 37
 even if Bakke had been unable to prove that he would have been admitted in the absence of a special program, it would not follow that he lacked standing. The constitutional element of standing is plaintiff's demonstration of any injury to himself that is likely to be redressed by favorable decision of his claim. The trial court found such an injury, apart from failure to be admitted, in the University's decision not to permit Bakke to compete for all 100 places in his class, simply because of his race.
 
 
 38
 Id. (citations omitted) (emphasis added). Thus, it could be argued that Bakke is on point because it defines a "likelihood that plaintiff be redressed" as a likelihood that the plaintiff be allowed to compete, rather than a likelihood that the plaintiff be able to succeed.
 
 
 39
 The opportunity to compete and the opportunity to prevail, however, are not wholly unrelated. For instance, in Doherty v. Rutgers School of Law-Newark, 651 F.2d 893, 902 (3d Cir.1981), as in Bakke, a white applicant challenged a graduate school's admissions program. The school argued that the applicant lacked standing to sue, because he "did not possess the qualifications to have been admitted in the absence of the minority student program he challenges." Id. at 895. In response, the applicant relied on Bakke. The district court granted the school's motion to dismiss, and the Third Circuit affirmed, and interpreted Bakke as holding that even though an unsuccessful applicant need not show that he or she "would have been admitted in the absence of the challenged discriminatory program," he or she still must show that "there was a chance of successful admission had s/he not been prohibited from competing for all the seats." Id. at 902 (emphasis in original). The court went on to hold that Bakke was distinguishable, because the plaintiff "did not meet the criteria needed for acceptance for any of the seats at Rutgers Law School" and a favorable holding would not "substantially increase [the plaintiff's] chances for admission." Id.
 
 
 40
 In sum, Doherty stands for the proposition that even under Bakke, a plaintiff does not have standing unless he or she would have had a "realistic chance," id. of some benefit in the absence of the defendant's constitutional violations. In this case, Nor-West apparently did not have a chance of successfully competing with Continental. Thus, Bakke is distinguishable, and Doherty is on point.
 
 
 41
 For the same reason, Arlington Heights and other cases cited by Nor-West are distinguishable. In Arlington Heights, a non-profit housing developer contracted to purchase a tract of land in order to build racially integrated low-income housing. The developer's contract, however, was contingent upon securing rezoning from the municipality in which the land was located. After the municipality denied rezoning, the developer filed a suit alleging unconstitutional racial discrimination. The municipality argued that the developer lacked standing to sue, because even if the municipality rezoned the property at issue, the developer "would still have to secure financing, qualify for federal subsidies, and carry through with construction." Arlington Heights, 429 U.S. at 261, 97 S.Ct. at 561. The Supreme Court disagreed, because the developer had "shown an injury to itself that is 'likely to be redressed by a favorable decision.' " Id. at 262, 97 S.Ct. at 561, quoting Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (emphasis added). See also Bryant v. Yellen, 447 U.S. 352, 368, 100 S.Ct. 2232, 2241, 65 L.Ed.2d 184 (1980) (standing exists where it was "likely," even if uncertain, that intervenors would benefit from favorable verdict); Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 74-77, 98 S.Ct. 2620, 2630-32, 57 L.Ed.2d 595 (1978) (affirming district court's finding of standing where the defendant's conduct caused "substantial likelihood" of injury to the plaintiffs); cf. L. Tribe, American Constitutional Law, Sec. 3-18, at 132 (2d ed. 1988) (citing Arlington Heights in support of proposition that standing exists if the plaintiff's "transaction or project is demonstrably prevented by nothing but a challenged restriction") (emphasis added).
 
 
 42
 Because Nor-West was not willing or financially able to compete with Continental, we find that Nor-West was not likely to benefit from the grant of a second franchise in this case, and therefore lacked standing. Thus, Arlington Heights, like Bakke, is distinguishable.
 
 
 43
 Accordingly, we reject Nor-West's claim that it has standing because it was denied the opportunity to compete against Continental.
 
 
 44
 5. Can Standing Be Determined After a Jury Verdict?
 
 
 45
 Nor-West next argues that "[t]o deny standing after a full adversarial trial, moreover, defeats the basic policies underlying standing." Appellant's Opening Brief at 31. In support of this proposition, Nor-West cites Thurston v. Dekle, 531 F.2d 1264, 1270-71 (5th Cir.1976) (Thurston ), vacated on other grounds, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978), and 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, Jurisdiction 2d Sec. 3531.15 at 105 (2d ed. 1984) ("Wright & Miller").
 
 
 46
 The Wright & Miller treatise does not support Nor-West's argument. These commentators state that:
 
 
 47
 [i]f the case survives to trial, the burden of establishing standing remains with the plaintiff. It may be possible to arrange the trial to present standing issues first, so that undue waste is avoided if the case must be dismissed.... After a trial, the court of appeals reviews the matter [of standing] on the entire record, extending appropriate deference to the findings of the trial court.
 
 
 48
 Wright & Miller Sec. 3531.15, at 104-05 (emphasis added). Thus, the Wright & Miller treatise clearly suggests that the issue of standing may be resolved at trial, and Nor-West's representation to the contrary is incorrect.
 
 
 49
 In Thurston, a class of city employees alleged that the city's procedures for dismissal were constitutionally inadequate. After the district court entered judgment for the plaintiff, a Fifth Circuit decision deprived the class representative of standing. The Fifth Circuit nevertheless decided to reach the merits, holding that:
 
 
 50
 [u]nder the unique facts of this case, we hold that where the purpose of the standing requirement has been fulfilled by the presence of an adversary context which has remained concrete throughout the entire process and where standing was subsequently determined not to exist because of a change in law affecting subject matter jurisdiction, this court should reach the merits.
 
 
 51
 Thurston, 531 F.2d at 1271. Because Nor-West's standing has not been affected by decisions issued while the present case was on appeal, Thurston is obviously not on point.
 
 
 52
 Accordingly, we hold that the district court's decision to decide the question of standing at trial was not reversible error.
 
 6. Third-Party Standing
 
 53
 Finally, Nor-West argues that even if it lacked standing in its own right, it should be allowed to vindicate the rights of St. Paul cable television consumers to the benefits of competition, or of the threat of competition.
 
 
 54
 If, as the district court found, Nor-West was not able or willing to compete with Continental, St. Paul cable television consumers obviously would not have experienced either the reality or the possibility of competition. It follows that if Nor-West does not have standing to sue on its own behalf, it also does not have standing to sue on consumers' behalf.[5]
 
 
 55
 Accordingly, we hold that the district court's endorsement of the jury's special verdict answers, and its holding that Nor-West lacked standing to sue, was correct.
 
 B. Damages for Pursuit of a Monopoly
 
 56
 Special Verdict No. 10 asked the jury "[w]hat sum of money did Nor-West expend in attempting to obtain a cable franchise from the City of St. Paul in 1982-83?" Nor-West I, slip op. at 3. The jury answered that Nor-West had spent $265,000.00. Nor-West accordingly claims that it was entitled to this amount as damages. The district court rejected Nor-West's claim, because it "would only award this amount if, in fact, the Request for Proposal ordinance was found to be unconstitutional. As a general rule, unsuccessful bidders are not entitled to recover damages ... [thus] plaintiffs lack standing," Nor-West I, slip op. at 9.
 
 
 57
 The City argues that Nor-West's expenditures in 1982-83 relate not to Nor-West's attempts to obtain a second cable franchise to compete with Continental, but to its earlier attempts to obtain a cable monopoly from the City of St. Paul. However, Nor-West explicitly rejects the City's contention that Nor-West "sought the invalidation of Continental's franchise and the issuance of the franchise to itself," Reply Brief for Appellant at 2 (emphasis added), quoting Brief for Appellee City of St. Paul at 8. Indeed, Nor-West claims that its complaint and later actions "do not support the conclusion that Nor-West was actually seeking an exclusive franchise." Reply Brief for Appellant at 3, and argues that such cable monopolies are unconstitutional. If Nor-West does not request damages for the denial of a cable monopoly, Nor-West cannot now obtain damages on that basis.
 
 
 58
 Accordingly, we find that Nor-West cannot recover money spent before it decided to compete with Continental instead of supplanting it as a cable monopolist.[6]
 
 C. Discovery Order
 
 59
 Under Fed.R.Civ.P. 16, district judges and magistrate judges may hold pretrial conferences and issue pretrial orders in order to expedite pending litigation. Pretrial orders may address, inter alia, "the identification of witnesses and documents." Fed.R.Civ.P. 16(c)(5).
 
 
 60
 In January 1987, the magistrate judge[7] issued a pretrial order which, inter alia, required Nor-West to disclose the identity of its expert witnesses and the nature of their testimony a month before defendants' experts did so, and required Nor-West's experts to "have finally formulated opinions" a month before defendants' experts were required to do so. The district court summarily affirmed the magistrate's order.
 
 
 61
 On appeal, Nor-West argues that the district court abused its discretion by requiring Nor-West to explain its experts' testimony first. Nor-West reasons that it should not have had to guess what sort of cable system it would have to be able to build in order to have standing, and that the City had the burden of proving its defenses. These considerations, if dispositive, would presumably bar even an order requiring a simultaneous exchange of witnesses' names, because the question of what type of system Nor-West allegedly intended to build was not addressed until trial. See Nor-West II, slip op. at 5 ("the kind of system which the plaintiff sought to build was for the jury itself to decide").
 
 
 62
 Ordinarily, pretrial orders require the parties to list their witnesses simultaneously. See, e.g., Patterson v. F.W. Woolworth Co., 786 F.2d 874, 879 (8th Cir.1986) (district court "required all parties to file statements concerning the anticipated testimony of expert witnesses by [same date]"); Schooley v. Kennedy, 712 F.2d 372, 373 (8th Cir.1983) ("the district court filed a pretrial order which included the requirements that ten days prior to trial the parties submit a proposed list of witnesses").
 
 
 63
 Because a "simultaneous witnesses" pretrial order would not have given Nor-West any more notice of defendants' theories than the order actually issued, we hold that Nor-West was not prejudiced by the district court's decision to require Nor-West to list its witnesses first. Even if the pretrial order had been prejudicial, it was not reversible error. The question of what sort of system the City could have required Nor-West to build is not dispositive if, as the jury found, Nor-West did not intend to build a competitive cable television system and was unable to operate "the cable television system it has requested permission to build," Nor-West I, slip op. at 2.
 
 D. Special Verdicts and Jury Instructions
 
 64
 Nor-West next challenges the district court's special verdicts and jury instructions, on the grounds that (1) the district court erroneously failed to instruct the jury what Nor-West had to do to be financially capable of competing with Continental, (2) Special Verdicts Nos. 11-15 were erroneous and prejudicial, (3) the district court erred by asking the jury about the validity of the City's reasons for denial of a second franchise without asking about the validity of the City's motives, (4) Nor-West's financial strength is irrelevant to the merits of its claim, (5) the district court erroneously submitted the substantive issue of first amendment protection to the jury, and (6) the issue of general damages should have been submitted to the jury.
 
 Nor-West's first argument is that:
 
 65
 [s]tanding, for purposes of damages, required Nor-West to convince the jury that it had the ability and intent to build a competitive cable system. That turned, in large part, on the system it could be required to build. The court, however, refused to make any rulings as to which, if any, of City's demands could be imposed on Nor-West, which was highly prejudicial.
 
 
 66
 Brief for Appellant at 42. The district court rejected this argument, because "there were irreconcilable differences of opinion between counsel for [Nor-West and the City] as to what are permissible requirements." Nor-West II, slip op. at 5. Furthermore, the district court's standing instructions were "structured so that the jury first had to determine what kind of system [Nor-West] sought to build (not what was legally permissible to build), whether it had the financial [ability to operate a cable system] ... and whether it had the necessary intent." Id. at 6.
 
 
 67
 As the district court noted, Special Verdicts Nos. 1-3 and Nos. 5-7 asked the jury what system "Nor-West requested permission to build ... in competition with Continental," Nor-West I, slip op. at 1-2 (emphasis added). Thus, the question of what system the City would have required Nor-West to build is beside the point, and Nor-West lacks standing even if the district court should have instructed the jury to determine what system the City should have required Nor-West to build.
 
 
 68
 The other arguments raised by Nor-West all relate to issues other than standing. For instance, the validity of Special Verdicts Nos. 11-15 (which address the possible disruption resulting from the installation of a second cable system) is irrelevant to the issue of standing, because the district court's standing decision was based on the jury's answers to Special Verdicts Nos. 1-3 and 5-7. Similarly, the validity of the City's substantive defenses or of any instructions related to the merits of Nor-West's claim, as well as Nor-West's eligibility for recovery of general damages, relate to the merits of Nor-West's first amendment claim and not to the issue of standing.
 
 
 69
 Accordingly, we hold that the district court did not abuse its discretion in giving the special verdicts and instructions to the jury.
 
 E. Evidentiary Issues
 
 70
 Nor-West also challenges two of the district court's evidentiary rulings: the exclusion of one of Nor-West's expert witnesses and the exclusion of an indemnity agreement between the City and Continental. Each of these issues will be addressed in turn.
 
 1. Excluded Expert Testimony
 
 71
 At trial, Nor-West sought to introduce the testimony of William Lee, Nor-West's journalism expert. The district court excluded such testimony, because Dr. Lee's testimony was "without foundation and irrelevant to the issues submitted to the jury." Nor-West II, slip op. at 14. On appeal, Nor-West challenges the district court's exclusion of Lee's testimony, on the grounds that Lee would testify as to "the effect of [the] City's control of the cable television market on cable operators as journalists, including the danger of content discrimination," Brief for Appellant at 42, and "the need for franchise provisions and the genuineness of [the] City's alleged defenses and interests ... such as universal service and [the need for] access channels," Reply Brief for Appellant at 19-20. We fail to see how such testimony relates to standing, and accordingly find it unnecessary to decide whether Lee's testimony was properly excluded.
 
 2. The Indemnity Agreements
 
 72
 Nor-West also unsuccessfully sought to introduce evidence of two indemnity agreements between Continental and the City. These agreements provided that Continental would indemnify the City from liability arising out of the City's franchising procedure and its failure to award more than one cable franchise. The district court excluded such evidence under Federal Rules of Evidence 403 and 411. On appeal, Nor-West attacks the district court's ruling on the merits, and argues that the indemnity agreements are relevant to standing, for two reasons.
 
 
 73
 First, Nor-West argues that because the agreements were negotiated before December 5, 1983 (the date on which Nor-West first requested a second franchise), their existence is probative as to whether Nor-West in fact intended to seek a second franchise and the credibility of City officials' testimony that "they had no idea, until the receipt of the December 5 letter, that Nor-West was claiming to seek a second franchise," Reply Brief for Appellant at 18. However, at least one other company besides Nor-West and Continental competed for an exclusive franchise. Thus, defendants' execution of the indemnity agreements does not prove that defendants believed that Nor-West planned to seek a competitive franchise, let alone that Nor-West actually intended to do so.
 
 
 74
 Second, Nor-West argues that the indemnity agreements prove that the City's expert witnesses were biased, because they were "in fact, testifying for Continental and not for [the] City, as the jury was led to believe." Reply Brief for Appellant at 18. As the City was the major defendant in this action, it is obvious that the City's expert witnesses would have been equally biased no matter which defendant was paying them.
 
 
 75
 We therefore hold that the district court's evidentiary rulings were unrelated to the issue of standing, and accordingly decline to address those rulings on the merits.
 
 F. The Dismissal of Continental
 
 76
 Finally, Nor-West challenges the district court's dismissal of Continental as a defendant. If, as we believe, Nor-West lacks standing to sue the City, it also lacks standing to sue Continental.
 
 
 77
 Accordingly, we hold that Nor-West lacks standing to bring the present suit and affirm the district court's judgment in favor of defendants.
 
 
 
 [1]
 The Honorable Donald D. Alsop, Chief Judge, United States District Court for the District of Minnesota
 
 
 [2]
 "Actual malice" has been defined as "knowledge that [a statement] was false or ... reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)
 
 
 [3]
 Even if Bose did require de novo review of the jury's findings, it may be that the district court engaged in such review. The district court stated that even if it was not "bound by the jury's findings ... the court chooses to be bound by the jury's findings." Nor-West I, slip op. at 6 (emphasis added). The district court later held that even if Bose required it to "independently review the record, the court ... did so by specifically choosing to adopt the findings of the jury as the facts in this action." Nor-West II, slip op. at 5
 
 
 [4]
 Nor-West cites numerous other decisions in support of the proposition that the likelihood of actual economic injury may not be considered in ascertaining whether it has standing to sue. See Brief for Appellant at 32 & n. 99. Some of the cases cited by Nor-West, however, simply do not involve the standing doctrine. See, e.g., Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (denial of parade permit unconstitutional where officials not guided by any standards); Louisiana v. United States, 380 U.S. 145, 152-53, 85 S.Ct. 817, 821-22, 13 L.Ed.2d 709 (1965) (literacy test unconstitutional if arbitrarily administered); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (conviction for breach of peace violated due process when the defendant followed official instructions); Staub v. Baxley, 355 U.S. 313, 332, 78 S.Ct. 277, 287, 2 L.Ed.2d 302 (1958) (officials may not be allowed standardless discretion to grant or deny permits); Kunz v. New York, 340 U.S. 290, 293-94, 71 S.Ct. 312, 314-15, 95 L.Ed. 280 (1951) (same)
 
 
 [5]
 We accordingly decline to address the City's arguments that (1) the issue of third-party standing was not raised previously, and (2) even those who seek to assert the rights of third parties must have standing to sue on their own
 
 
 [6]
 We therefore decline to address the City's argument that Nor-West is barred from recovering damages under state law
 
 
 [7]
 Janice M. Symchych, United States Magistrate Judge for the District of Minnesota