13 F.3d 1327
 PREFERRED COMMUNICATIONS, INC., Plaintiff-Appellant,
v.
CITY OF LOS ANGELES; Department of Water and Power,
Defendants-Appellees.
PREFERRED COMMUNICATIONS, INC., Plaintiff-Appellee,
v.
CITY OF LOS ANGELES; Department of Water and Power,
Defendants-Appellants.
PREFERRED COMMUNICATIONS, INC., Plaintiff-Appellant,
v.
CITY OF LOS ANGELES; Department of Water and Power,
Defendants-Appellees.
PREFERRED COMMUNICATIONS, INC., Plaintiff-Appellee,
v.
CITY OF LOS ANGELES; Department of Water and Power,
Defendants-Appellants.
 Nos. 91-55625, 91-55665, 91-56261 and 91-56269.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1993.
Decided Jan. 7, 1994.
 
 Harold R. Farrow, Robert M. Bramson, Anne M. Ronan, Farrow, Schildhause & Wilson, Walnut Creek, CA, The Boccardo Law Firm, San Jose, CA, for plaintiff-appellant Preferred Communications, Inc.
 Larrine S. Holbrooke, Tillman L. Lay, Karen Hochstein Neuman, Barbara D. Ranagan, Miller & Holbrooke, Washington, DC, James K. Hahn, City Atty., Pedro B. Echeverria, Sr. Asst. City Atty., Edward J. Perez, Asst. City Atty., Los Angeles, CA, for defendant-appellee City of Los Angeles, California.
 Appeal from the United States District Court for the Central District of California.
 Before: KOZINSKI, SILER,* and KLEINFELD, Circuit Judges.
 PER CURIAM:
 
 
 1
 We revisit some of the issues left open in Preferred Communications, Inc. v. City of Los Angeles, 754 F.2d 1396 (9th Cir.1985), aff'd, 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986).
 
 Background[1]
 
 2
 Los Angeles, like most large cities, requires permits for those seeking to provide cable television service to city residents. Under its Charter, the city may grant any "franchise, permit or privilege to erect, construct, lay, maintain and operate, poles, pipes, conduits, wires or cable upon, over, under, in, across or along any street ... road or other place ... for the purpose of ... communication by telephone, telegraph or signal systems." Los Angeles, Cal., Ordinance No. 58,200, Sec. 2(4). The ordinance specifies that franchises are to be awarded through a process known as a notice of sale ("NOS"). Id. Sec. 5; see also CR 450 p 34.
 
 
 3
 To adapt the general franchise process to cable television, in 1976 the city developed a "Cable Communications in Los Angeles Master Plan." CR 158 p 6, CR 175 p 6. Under this plan, the city is divided into fourteen cable franchise areas; each area is served by one cable operator. CR 114 exh. A, at 5-6. Once the city decides to issue an NOS for an area, it receives bids; if it decides to award a franchise, it must award it to the highest "responsible" bidder, which means that considerations other than the dollar amount of the bid are taken into account. CR 114, exh. A, at 18-19.
 
 
 4
 In 1980, the city issued an NOS for cable service in South Central Los Angeles. It received three applications, but no franchise was awarded. CR 114, exh. A, at 30. In 1982 the city issued another South Central NOS. Only one application was received, and the city granted the applicant the South Central franchise. Id., exh. H.
 
 
 5
 Preferred Communications, Inc., was formed in 1983 to provide cable service to South Central Los Angeles. Since it didn't exist at the time of either the 1980 or 1982 NOS, it participated in neither. In 1983 Preferred requested pole attachment service--permission to lease space on utility poles to string the necessary cable wires--from Pacific Telephone and Telegraph Company and the Los Angeles Department of Water and Power. Each utility informed Preferred that it would first have to obtain a franchise from the city. CR 191 p 8-9. Preferred then asked the city for a franchise. It was informed that the city would issue only one franchise to each area, and that the franchise in South Central had already been awarded. Id. p 10. Preferred wrote several letters to the city requesting a franchise, but another NOS was never offered. Id. pp 11-15.
 
 
 6
 Preferred then sued the city, alleging that the cable franchising system violated the Federal and California constitutions. Preferred claimed that the provision of the city Charter used for franchising, and the procedures which had grown up around it, violated the First Amendment's free speech and free press guarantees. Preferred sought both injunctive and monetary relief.
 
 
 7
 The district court dismissed Preferred's complaint for failure to state a claim. We reversed, holding that the activity Preferred sought to engage in--providing cable service--was entitled to First Amendment protection. Taking as true the allegations in Preferred's complaint, we held that the city could not limit the award of franchises to a single operator in each area of the city, if the city's infrastructure was capable of accommodating additional providers. 754 F.2d at 1411 (Preferred I ).
 
 
 8
 The Supreme Court affirmed our decision, but did so "on a narrower ground." 476 U.S. 488, 493, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986) (Preferred II ). The Court recognized that Preferred's "factual allegations implicate[d] protected speech," id. at 495, 106 S.Ct. at 2038, but remanded to the district court for the development of a record on "the present uses of the public utility poles and rights-of-way and how respondent proposes to install and maintain its facilities on them." Id. at 495, 106 S.Ct. at 2038.
 
 
 9
 On remand the district court decided the case on cross motions for summary judgment. Most notably, the court invalidated the city's one operator/one area policy, through which the city awarded only one franchise per cable service area. The district court also invalidated several other aspects of the city's franchising scheme[2] and upheld some others.[3] Both sides appeal.
 
 Discussion
 
 10
 * The city first argues Preferred lacks standing to challenge the franchising scheme. The city's argument is simple: Constructing a cable system requires substantial financial resources and technical knowledge; because Preferred is not capable of meeting these requirements, it cannot challenge the franchising scheme. The city relies on Nor-West Cable Communications Partnership v. City of St. Paul, 924 F.2d 741 (8th Cir.1991), for the proposition that cable operators who are not "ready, willing and able" to build a cable system cannot challenge such schemes. Id. at 749.
 
 
 11
 Nor-West, however, is not entirely on point. The Nor-West court had the benefit of a special jury verdict. Among the jury's findings were that Nor-West was incapable of providing the necessary technical capability or the financial resources to construct a cable system. Id. at 744-45. But the jury also found that, even had Nor-West been given the opportunity to build the cable system, it would not have done so. Id. at 745. The Eighth Circuit concluded Nor-West lacked standing because it "was not willing or financially able to compete." Id. at 749. Nor-West is distinguishable because it rested in part on the fact that the cable company was unwilling to build a cable system. Nothing in the record here suggests that Preferred doesn't intend to build a South Central cable system if it's awarded the franchise; in fact, the record is to the contrary. See, e.g., CR 174, exh. 3 at 3; CR at 191 p 2.
 
 
 12
 It is clear that Preferred has a concrete stake in this litigation; if it prevails in getting the monopoly requirement invalidated, it will have removed a major obstacle preventing it from receiving the franchise permit. See Bullfrog Films, Inc. v. Wick, 847 F.2d 502, 506-08 (9th Cir.1988). This in itself affords it standing since Preferred will have increased its ability to compete for the franchise, despite its inability to prove it ultimately will be awarded one.
 
 
 13
 We therefore turn to the merits.
 
 II
 
 14
 It is now well established that regulation of cable operators implicates both the Free Speech and Free Press Clauses of the First Amendment. See, e.g., Leathers v. Medlock, 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991); Preferred II, 476 U.S. at 494, 106 S.Ct. at 2037; see also Preferred I, 754 F.2d at 1403. The district court struck down the one operator/one area provision of the franchising scheme as inconsistent with the First Amendment. Although the court found the interests asserted by the city to be substantial, it nonetheless concluded that the limitation to only one operator was not narrowly tailored because it was not persuaded "that the disruption and safety hazards would be sufficiently significant as to preclude but one cable operator from exercising its speech rights." CR 338 at 16.
 
 
 15
 We begin with what we said in Preferred I, where we framed the issue of the one area/one operator policy as follows:
 
 
 16
 Can the City, consistent with the First Amendment, limit access by means of an auction process to a given region of the City to a single cable television company, when the public utility facilities and other public property in that region necessary to the installation and operation of a cable television system are physically capable of accommodating more than one system? Our answer is no, the City cannot.
 
 754 F.2d at 1411 (emphasis added).[4]
 
 17
 Nothing has occurred since Preferred I to change this analysis. Indeed, the critical fact the city then disputed--whether the utility infrastructure could accommodate a second system--the city has now conceded. See CR 338 at 15.
 
 
 18
 On this appeal, the city asserts essentially the same interests we found inadequate in Preferred I to support the one operator/one area requirement. The only difference is that, instead of resting on mere allegations, the city has now come forward with evidence to prove up each of its interests. As this case was decided by the district court on summary judgment, we accept as true the city's evidence; our analysis in Preferred I nonetheless disposes of most of the city's interests as a matter of law.
 
 
 19
 The city first argues it has a substantial interest in preventing the disruption and visual blight caused by additional cable wiring. It claims that further cable systems would force the rearrangement and replacement of existing utility poles and that the installation of another system would pose safety hazards to the public who use the streets and to the DWP employees who must work on the poles. See, e.g., CR 282 pp 14-16; CR 175 p 29; CR 452 pp 37-38. The city's proof doesn't alter the analysis in Preferred I, which assumed these were substantial interests. Preferred I held that limiting the market to a single cable operator was not narrowly tailored to advance the government's interests. See 754 F.2d at 1406. There is nothing in this record to change that conclusion, and we adhere to it.
 
 
 20
 The same concerns that underlay Judge Sneed's excellent opinion in Preferred I trouble us as well: "[A]llowing only the single company selected through the franchise auction process to erect and operate a cable system in each region" exacts too heavy a toll on the First Amendment interests at stake here. 754 F.2d at 1406. Competition in the marketplace of ideas--as in every other market--leads to a far greater diversity of viewpoints (and better service) than if a single vendor is granted a crown monopoly. See generally Jan Bellamy, Two Utilities are Better than One, Reason, Oct. 1981 (describing competitive electric utility industry). The risk that a single operator will be captured by city hall (or in turn will capture regulators) is far greater than where two or more operators face off against each other and must contend with the harsh realities of competition.
 
 
 21
 This is not to say that the city must grant access to its utility infrastructure to "all cable-television comers, regardless of size, shape, quality, qualifications or threat to the ultimate capacity of the system." Pacific West Cable Co. v. City of Sacramento, 798 F.2d 353, 355 (9th Cir.1986). Once the city awards a second franchise, the First Amendment calculus may shift. The marginal benefits of another operator will be considerably less when the monopoly is broken and competition is introduced; at the same time, the burden on the city will increase as more cable systems are added. There will thus surely come a point where the city may refuse to grant an additional cable franchise because the added benefit of another franchise is low while the cost in terms of the city's utility-carrying capacity is high. We hold today only that limiting speech to a single operator is "substantially broader than necessary to achieve the government's interest," and therefore invalid. Ward v. Rock Against Racism, 491 U.S. 781, 800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989).
 
 
 22
 Admittedly, performing the delicate balancing task we outline here is not easy, but the city has painted itself into this corner by conflating the programming and utility functions of cable. For First Amendment purposes, we are concerned primarily about restrictions on programming, not on stringing wires or digging trenches; without the signals transmitted along the wires, cable is basically like any other utility, which may be regulated without implicating the First Amendment. The city's decision to permit a single operator to not only build the cable plant but also provide all of the programming transmitted on it means that all regulations--even those which relate only to the construction of the plant--are subjected to demanding First Amendment scrutiny because of their direct impact on programming. By contrast, if the city allowed only one company to construct the cable infrastructure but required it to carry programming from multiple sources, the questions we faced would be different. We need not resolve those questions today.
 
 
 23
 The city also argues, as it did in Preferred I, that the physical scarcity of its utility infrastructure justifies the one area/one operator requirement. The city has conceded, however, that its infrastructure could accommodate at least one further cable system. CR 338 at 15. The essence of the city's argument, therefore, is not that there is no space whatsoever for another cable system but that permitting additional cable systems will bring South Central's utility infrastructure closer to exhaustion. The city claims it may need additional space to expand existing uses or to provide novel, undiscovered services. CR 282 pp 35-41. At bottom, then, the city would rather reserve the space for some other uses than give it to Preferred.
 
 
 24
 This, too, we considered and rejected in Preferred I: "We cannot accept the City's contention that, because the available space on such facilities is to an undetermined extent physically limited, the First Amendment ... permit[s] it to restrict access and allow only a single cable provider to install and operate a cable television system." 754 F.2d at 1404.[5] Given the city's concession that at least one more cable system can be added, the reasoning of Preferred I controls.
 
 
 25
 The city does advance one interest that was left open in Preferred I: That only one cable system can profitably operate in South Central and the city therefore has an interest in creating a regulated monopoly to operate a franchise. This is the so-called "natural monopoly" argument which has been rejected as a justification for regulation of print media. See Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 254, 258, 94 S.Ct. 2831, 2837, 2840, 41 L.Ed.2d 730 (1974); see also Preferred I, 754 F.2d at 1405 (expressing doubts about natural monopoly theory).
 
 
 26
 There are important differences between print and cable media, however. Most significant is that cable systems place a strain on public resources: They disrupt traffic and take up public easements and rights of way. Unlike newspapers, a "cable company must significantly impact the public domain in order to operate." Community Communications Co., Inc. v. City of Boulder, 660 F.2d 1370, 1379 (10th Cir.1981). The economic oddities of cable, coupled with the burden on public resources caused by the entry--and exit--of additional operators, may arguably justify some limitations on the number of operators. Id.; see also Omega Satellite Products Co. v. City of Indianapolis, 694 F.2d 119, 128 (7th Cir.1982) (Posner, J.). But this is just another way of expressing the city's interest in avoiding traffic disruption and visual blight, which we have already disposed of. See pp. 1330-1331, supra. Repackaging these interests under the rubric of natural monopoly makes them no more compelling. For the reasons discussed above, the one operator/one area limitation is not narrowly tailored to advance this interest. We emphasize again: The city may restrict the number of entrants into the cable market, but it may not restrict the number to only one.[6]
 
 III
 
 27
 Unresolved issues remain: In addition to the monopoly policy, the court below struck down many other aspects of the city's franchising scheme, and it upheld some others. Our review of these requirements is at best difficult and at worst advisory, because Preferred did not participate in the 1982 NOS and has never actually applied for a South Central cable franchise.
 
 
 28
 In Preferred I, the city argued Preferred lacked standing to even challenge the franchise scheme because it had failed to participate in the 1982 auction. We disagreed, finding that Preferred had standing, having "been barred from access because of its refusal to enter the bidding process and abide by the City's numerous conditions." 754 F.2d at 1402-03.
 
 
 29
 Preferred I dealt only with whether Preferred had standing to challenge the 1982 NOS; it didn't address the effect, if any, of Preferred's efforts to obtain a second franchise after the initial one was awarded. Counsel for Preferred informed us at oral argument that Preferred had in fact tried to get a South Central franchise in 1983 but was rebuffed because of the monopoly policy. Upon further questioning, counsel conceded that Preferred had never formally applied to the city for a South Central franchise nor petitioned for a waiver of the one area/one operator requirement. Rather, it made an informal inquiry, was told that only one franchise could be awarded and pressed no further. The city argues forcefully that we can only speculate what would have happened if Preferred had actually applied.
 
 
 30
 We agree this is all pretty speculative, but the city, not Preferred, is to blame. Preferred claims that applying would have been a costly and futile gesture, and that its few informal attempts to find out about the possibility of a second franchise were brushed aside by city officials because of the established monopoly policy. Preferred was justified in believing that a formal application would have been futile: Upon questioning, the city's lawyer admitted that it had never granted a second franchise in any of the fifteen cable areas in Los Angeles, and that there are no plans to do so.
 
 
 31
 Given that we hold the one operator/one area policy is invalid, the city must make available through an appropriate NOS at least one additional franchise for South Central Los Angeles. While we decline Preferred's request that we order the city to actually grant that franchise to it, the invalidation of the monopoly policy means that the obstacle preventing Preferred from applying before has now been removed from its path. Preferred will have an opportunity to apply and compete for a South Central franchise. Should it choose to do so, this will tell us several important things.
 
 
 32
 First, we will learn whether Preferred is in fact "ready, willing and able" to operate a cable system. The city must issue another request for proposals pursuant to its Cable Communications Master Plan; if Preferred fails to participate, we will know it has suffered no injury from the franchise scheme. Alternatively, Preferred may apply but be denied the franchise on the basis that it lacks the requisite technical or financial qualifications. Again, if that's so, Preferred will lack standing to proceed with this litigation. It's also possible Preferred will be denied a franchise because it failed to satisfy one of the disputed requirements; in that case, we will be able to review the requirement's constitutionality without having to speculate as to its operation or relation to the overall scheme. The franchise may also be awarded to another operator who makes a more attractive bid, in which case Preferred will have no standing to challenge any of the restrictions placed on that franchisee. Finally, the auction may result in the award of a franchise to Preferred. If that happens, then all of Preferred's claims for injunctive relief will become moot.
 
 
 33
 Moreover, the invalidation of the monopoly policy--the heart of the city's franchise system--may significantly alter the rest of the scheme. Many of the provisions, such as universal service, may make sense in the context of a regulated monopolist but will be unnecessary or counterproductive once competition is introduced. And while we express no view on the rest of the district court's order, the city may well heed the concerns of the learned district judge who found that many of the provisions violated the First Amendment. All government officials have a duty to uphold the United States Constitution, and we're confident that Los Angeles' officials are mindful of this responsibility.
 
 
 34
 Since there are so many ways we might well avoid having to confront these difficult constitutional issues, it would be precipitous of us to reach them at this time. Were we to try, we would have to "decide the legal questions posed by the parties without a more thoroughly developed record ...," Preferred II, 476 U.S. at 494, 106 S.Ct. at 2037, something the Supreme Court refused to do when reviewing our last opinion. Id. If we failed to follow the Court's example, "we would not escape the charge of rendering advisory opinions poorly disguised as sweeping dicta." Preferred I, 754 F.2d at 1401.[7]
 
 IV
 
 35
 The district court awarded Preferred injunctive relief and $1 in nominal damages. Preferred sought monetary damages in the form of lost profits from its failure to receive a franchise. The district court denied the request. CR 248 p 9. Preferred then re-styled its damages theories as claims for "lost asset value" and "additional construction costs" from the delay caused by the city's refusal to let Preferred compete for a franchise. The court ruled that the invalidation of parts of the franchising scheme did not "automatically confer [on Preferred] the right to install a cable system in the South Central area," rendering any claim for damages too speculative. CR 343 at 4.
 
 
 36
 Preferred's claim for "lost asset value" is based on the difference in value between a cable system constructed in 1983 and one constructed in 1988; it is merely another way of measuring lost profits. See Los Angeles Memorial Coliseum Comm'n v. NFL, 791 F.2d 1356, 1374 (9th Cir.1986); cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 87 (9th Cir.1969). This measure of damages assumes that Preferred would have actually built a cable system in 1983. "Additional construction costs," which measures the differences between the cost of building a system in 1983 and now, depends on the same assumption, as well as the further assumption that Preferred would and could build a system now if it were allowed to compete for a franchise.
 
 
 37
 While we have rejected the city's position that Preferred lacks standing because it is not "ready, willing and able" to finance and construct a cable system, the arguments advanced by the city do bear on the question of damages. The difficulty with Preferred's claims for damages is that they all depend on the very speculative assumption that Preferred would have built and operated a profitable cable franchise in South Central if it had only been given the chance. It's not clear this is so. While we're confident that Preferred genuinely wants and intends to build a cable system if awarded a franchise, the parties hotly contest whether Preferred actually has the technical or financial capacity to do so; and even if Preferred does, there may well be other more qualified operators who would receive the franchise instead. While Preferred is entitled to a chance to compete for a franchise, any claim for damages is much too speculative. See, e.g., Putnam v. Lower, 236 F.2d 561, 571-73 (9th Cir.1956).
 
 
 38
 The same problem also plagues Preferred's claim for "general and presumed damages," which it didn't raise below but urges on appeal. While Memphis Community School Dist. v. Stachura, 477 U.S. 299, 310-11, 106 S.Ct. 2537, 2544-45, 91 L.Ed.2d 249 (1986), permits an award of "presumed damages" when a constitutional injury is "likely to have occurred but [is] difficult to establish," the issue here is not one of quantifying the damages but whether Preferred actually suffered an injury at all. If we could know with certainty that "but for" the city's monopoly policy Preferred would have received the franchise, presumed damages might "approximate the harm that [Preferred] suffered and thereby compensate for harms that may be impossible to measure." Id. at 311, 106 S.Ct. at 2545. But we cannot know with certainty whether Preferred would even have received the franchise; its claim for "presumed damages" is just as speculative as its other damage claims.[8]
 
 Conclusion
 
 39
 The district court's order invalidating the one operator/one area requirement is AFFIRMED; the order denying monetary relief as to all claims is AFFIRMED; the rest of the district court's order is VACATED and the case is REMANDED. On remand the district court shall retain jurisdiction and, if the city fails to offer another franchise for bidding within due course, the district court shall order the city to do so. See Brown v. Board of Educ., 349 U.S. 294, 300-01, 75 S.Ct. 753, 756-57, 99 L.Ed. 1083 (1955) (Brown II ) (enforcement order). We AFFIRM the district court's rulings as to attorney's fees, Rule 11 sanctions and dismissal of the RICO claims in unpublished memoranda also filed today.
 
 
 
 *
 The Honorable Eugene E. Siler, Jr., United States Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 The facts are set out in detail in our opinion in Preferred Communications, Inc. v. City of Los Angeles, 754 F.2d 1396 (9th Cir.1985), and in the Supreme Court opinion affirming that decision, City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986). We merely summarize them here
 
 
 [2]
 The court struck down requirements dealing with "mandatory access/leased access" channels, "character," "state of the art," "option to buy," "uninterrupted service," "term of years," "application, filing fee and good faith deposit," "public access production facilities," "equipment and staff," "character generators," and "Cable Franchise Advisory Board." CR 520 at 2
 
 
 [3]
 The court found the "universal service," "localism," "prohibition of transfer" without consent, "franchise fee," "free access" to cable facilities for the city, "recourse and indemnity," "financial and technical qualifications," "customer service," "inspection of property and records," and "Notice of Sale Process" each to be constitutional. CR 520 at 2-3
 
 
 [4]
 The city argues that Preferred I is not law of the case since the Supreme Court affirmed on different grounds. The precise status of one of our opinions which has been affirmed by the Supreme Court on different grounds is uncertain. Does it continue to be the law of the case? Circuit precedent? We need not decide because we agree with the analysis in Preferred I and hew to it today
 
 
 [5]
 We note also that the city already has an alternative way of ensuring the availability of space for future uses if and when it becomes necessary. The California Public Utility Code provides that, in the event additional space is needed, the cable company must either surrender its occupation of the poles or bear the expense of creating additional capacity. See Cal.Pub.Util.Code Sec. 767.5(d). Given that state law already provides a mechanism by which the city may obtain additional space, a monopoly policy is not narrowly tailored to further the city's interest
 Admittedly, this alternative is not without costs. Even if the cable operator pays to reconfigure the wires and erect new poles, the city will still suffer significant disruption. We have already recognized that these are substantial interests, yet for the same reasons already given the monopoly policy is not narrowly tailored to further those interests.
 
 
 [6]
 Though we are aware of the 1992 Cable Television Consumer Protection and Competition Act, 47 U.S.C. Sec. 541, our ruling today does not implicate it since the parties agreed it was not relevant
 
 
 [7]
 Moreover, on remand the district court will likely receive further guidance from the Supreme Court's opinion in Turner Broadcasting System v. FCC, as the Supreme Court has just noted probable jurisdiction in that case. --- U.S. ----, 114 S.Ct. 38, 125 L.Ed.2d 787 (1993)
 
 
 [8]
 We are aware that Congress recently prohibited damages claims against municipal governments for claims arising from cable franchising. See 47 U.S.C. Sec. 555(a). At oral argument, counsel for Preferred argued that this prohibition was unconstitutional because it singled out cable as compared to other members of the press. But cf. Leathers v. Medlock, 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991) (sales tax which singles out cable operators doesn't offend First Amendment). Because we conclude Preferred was not entitled to damages under any of its theories, we do not reach this question of constitutional dimension. See Ashwander v. TVA, 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)